Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___





UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MYSPACE, INC., | CV 07-1929 ABC (AGRx) |
| Plaintiff, | ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| SANFORD WALLACE D/B/A FREEVEGASCLUBS.COM, REALVEGAS-SINS.COM, FEEBLEMINDED PRODUCTIONS, | |
| Defendant. | |

On June 11, 2007, Plaintiff MySpace, Inc. ("Plaintiff") filed the instant motion for a preliminary injunction.  Defendant Sanford Wallace d/b/a freevegasclubs.com, realvegas-sins.com, and Feebleminded Productions ("Defendant") opposed on June 20, 2007, and Plaintiff replied on June 27, 2007.  The hearing on this matter was held on July 2, 2007.  Based on the arguments of the parties and the pleadings in this case, the Court hereby GRANTS IN PART Plaintiff's motion for a preliminary injunction.

## I.   STATEMENT OF FACTS

Plaintiff is a "social networking service" that allows members to create unique personal profiles online to find and communicate with other people.  (Declaration of Sarah Kaleel ("Kaleel Decl.") ¶ 3.) Plaintiff provides its members with access to the MySpace.com website and the MySpace.com instant messenger and to other Internet-based features, content, and applications offered by Plaintiff in connection with the MySpace.com website.  (Id.)  Users also have the ability to send and receive communications to and from other MySpace.com users, create groups, and post comments on bulletins.  (Id.)  To become a member of MySpace.com, a user must create a profile by inputting his or her name, country, zip code, birth date, and gender, must create a password, and must provide an alternate email address to which confirmations and notifications can be sent.  (Id. ¶ 4.)  Moreover, when registering a user must agree with the Terms of Use Contract (the "TOU Contract") by clicking an "I accept" button and inputting a verification code, a unique series of letters and numbers designed to prevent the use of automated processes to create profiles.  (Id.)  To access a profile and message inbox, a user must log onto MySpace.com or log on to his or her individual MySpace.com page via an individual Uniform Resource Locator ("URL").  (Id.)

Plaintiff has expended significant time and resources in implementing various measures to prevent abuse of its service and curtail commercial spam (mass mailing of unsolicited commercial email), including limiting the number of messages that can be sent from a single MySpace.com account in a single day and using sophisticated algorithms to identify potential spammers.  (Id. ¶ 12.)

1  Limiting spam is important because it clogs networks, uses up

2  bandwidth, and degrades the user experience.  (<u>Id.</u> ¶ 11.)

3      Plaintiff claims that Defendant has engaged in an abusive multi-

4  faceted scheme to disseminate commercial messages and solicitation to

5  MySpace.com users.  Defendant admits that he maintains two websites,

6  freevegasclubs.com and real-vegas-sins.com (the "Wallace Websites").

7  (Declaration of Sanford Wallace ("Wallance Decl.") ¶ 3.)  In October

8  2006, Plaintiff's abuse team began receiving complaints related to the

9  Wallace Websites and after investigating, it discovered that Defendant

10  had created more than 11,000 similar MySpace profiles and 11,383

11  unique America Online email accounts to register those profiles.

12  (Kaleel Decl. ¶¶ 16-17.)  Because an individual could not easily

13  create this number of unique profiles and because the naming

14  conventions used to create each profile and email address were

15  consistent, the abuse team concluded that Defendant must have used an

16  automated "bot" to register these profiles and addresses.  (<u>Id.</u> ¶

17  18.)[1]  The abuse team concluded that, by creating more than 11,000

18  unique email addresses, Defendant circumvented Plaintiff's unique-

19  email-address registration requirement and by creating 11,000 unique

20  profiles, Defendant circumvented Plaintiff's daily limit on the number

21  of messages that can be sent from any one profile in a single day.

22  (<u>Id.</u> ¶ 19.)

23      Plaintiff accuses Defendant of first sending out a series of

24  messages, comments, and bulletins to MySpace users designed to

25

26  [1]For example, 2,077 of Defendant's MySpace profiles were named
   "What Pic Should I Upload?" and Defendant's AOL email addresses all
27  consisted of a 10- or 11-digit number followed by "@aol.com."  (Kaleel
   Decl. ¶¶ 16-17.)

28

1   redirect users to a website containing a MySpace.com logo and

2   soliciting the member's MySpace.com username and password through a

3   box that closely resembled the box used by members when logging onto

4   MySpace.com.   (Declaration of Rick Frazier ("Frazier Decl.") ¶¶ 5-6.)

5   Defendant used this technique (called "phishing") to "hijack" members'

6   usernames and passwords so he could then log onto those other members'

7   MySpace.com profiles and send messages to those users' "friends,"

8   directing them to the Wallace Websites.  (Id. ¶ 7.)   In total,

9   Defendant sent nearly 400,000 messages and posted 890,000 comments

10  from 320,000 "hijacked" MySpace.com user accounts.  (Id. ¶ 7, 13.)

11  Defendant also created "groups" on MySpace.com redirecting users to

12  the Wallace Websites, including altering the MySpace "unsubscribe"

13  link to point to the Wallace Websites rather than to actually allow

14  members to unsubscribe, and he used software code to lay graphics

15  containing links to the Wallace Websites over users' MySpace.com

16  profiles.  (Id. ¶ 11-12.)

17      Plaintiff claims it has been harmed by Defendant's activity,

18  including incurring bandwidth and delivery-related costs, costs

19  associated with devoting time, money, and resources to stop

20  Defendant's activities, and harm to its reputation from 800 complaints

21  lodged by users over Defendant's activities.  (Kaleel Decl. ¶¶ 20-21;

22  Frazier Decl. ¶ 15.)   The Wallace Websites also contain adult

23  material, and since Plaintiff allows users as young as fourteen years

24  old to create profiles, Defendant's activities on MySpace.com create

25  the possibility that minors might view this offensive content.

26  (Frazier Decl. ¶ 8, Exh. G; Kaleel Decl. ¶ 14.)

27

28                                      4

## II. LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must show "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." <u>Walczak v. EPL Prolong, Inc.</u>, 198 F.3d 725, 731 (9th Cir. 1999). "These two alternatives represent extremes of a single continuum, rather than two separate tests." <u>Id.</u> (internal quotations omitted). "Thus, the greater the relative hardship to [a plaintiff], the less probability of success must be shown." <u>Id.</u>; <u>see also</u> <u>International Jensen, Inc. v. Metrosound U.S.A., Inc.</u>, 4 F.3d 819, 822 (9th Cir. 1993). Moreover, "[t]he district court must also consider whether the public interest favors issuance of the injunction." <u>Southwest Voter Registration Educ. Project v. Shelley</u>, 344 F.3d 914, 917 (9th Cir. 2003). A preliminary injunction is an "extraordinary remedy" for which the need must be "clear and unequivocal." <u>Shelton v. National Collegiate Athletic Ass'n</u>, 539 F.2d 1197, 1199 (9th Cir. 1976).

## III. EVIDENTIARY OBJECTIONS

Plaintiff has objected to the entire declaration of Defendant's purported expert, Dr. Lawrence H. Miller. Miller's declaration purports to give legal conclusions on the interpretation of the statutes at issue in the Complaint, which is an impermissible subject for expert testimony. <u>See</u> <u>Crow Tribe of Indians v. Racicot</u>, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law."); <u>Mukhtar v. California State Univ., Hayward</u>, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002) ("[A]n expert witness cannot give an opinion

5

1  as to her *legal conclusion, i.e.,* an opinion on an ultimate issue of

2  law." (emphasis in original)).  Moreover, Miller has not testified to

3  any foundational knowledge of how MySpace.com works, and even

4  mistakenly opines that MySpace.com users can only send messages to

5  users on their "friends" list, which Plaintiff has persuasively

6  demonstrated is simply incorrect.  (Declaration of Aber Whitcomb

7  ("Whitcomb Decl.") ¶ 8.)  Finally, Miller is qualified only to testify

8  as an engineer at an aerospace corporation, and yet he offers opinions

9  on advertising issues, consumer perceptions, and social networking

10  sites such as MySpace.com, areas in which he has no apparent

11  qualifications.  His testimony on these points is not reliable as

12  required by <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 149 (1999).

13  Therefore, the Court sustains Plaintiff's objections to the Miller

14  Declaration and will accord his testimony no weight.

15      The Court has also reviewed and considered all other evidentiary

16  objections to facts on which the Court has relied, and hereby

17  overrules those objections.

18  **III. ANALYSIS**

19      Plaintiff seeks a preliminary injunction based on violations of

20  the CAN-SPAM Act, 15 U.S.C. §§ 7704(a)(1), (a)(3), (a)(5) and (b)(2),

21  and violations of Cal. Bus. & Prof. Code § 17529.5,§§ 22984 <u>et seq.</u>,

22  §§ 17200 <u>et seq.</u>, and §§ 17500 <u>et seq.</u>  As discussed below, the Court

23  finds that Plaintiff has demonstrated a likelihood of prevailing on

24  the merits of its claims under section 7704(a), so the Court need not

25  determine whether Plaintiff will also prevail on its state-law claims.

26      **A. Likelihood of Success on the Merits.**

27      The CAN-SPAM Act, 15 U.S.C. §§ 7701 <u>et seq.</u> (the "Act"),

28

1  regulates the manner in which commercial email is transmitted and

2  regulates various activities related to commercial email, such as

3  prohibiting the use of false, misleading, or deceptive information,

4  prohibiting the use of automated "bots" to create multiple email

5  accounts, and requiring certain contact information in commercial

6  electronic mail messages.  15 U.S.C. § 7704(a)(1), (a)(3), (a)(5),

7  (b)(2).  An "Internet access service" provider may seek to enjoin

8  conduct prohibited by sections 7704(a)(1) and 7704(b), or enjoin a

9  "pattern or practice" that violates section 7704(a)(2)-(5) and may

10  seek either actual or statutory damages, whichever is greater.  Id. §

11  7706(g)(1), (3).  However, because section 7704 is limited to

12  regulating only "commercial electronic mail messages," Plaintiff's

13  private right of enforcement exists only if Defendant's messages fall

14  within this statutory definition.

15      In opposition to Plaintiff's claims under the Act, Defendant

16  first argues that messages sent from MySpace.com member accounts do

17  not qualify as "electronic mail messages" as defined in the Act, and

18  therefore, Defendant cannot be liable under any of the Act's

19  provisions.  The Act defines an "electronic mail message" as "a

20  message sent to a unique electronic mail address."  Id. § 7702(6).  An

21  "electronic mail address" is "a destination, commonly expressed as a

22  string of characters, consisting of a unique user name or mailbox

23  (commonly referred to as the 'local part') and a reference to an

24  Internet domain (commonly referred to as the 'domain part'), whether

25  or not displayed, to which an electronic mail message can be sent or

26  delivered."  Id. §7702(5).  A "domain name" is "any alphanumeric

27  designation which is registered with or assigned by any domain name

28

7

1  registrar, domain name registry, or other domain name registration

2  authority as part of an electronic address on the Internet." Id. §

3  7702(4).

4        Defendant argues that MySpace.com messages do not fall within the

5  Act's definitions of "electronic mail message" and "electronic mail

6  address" because the addresses to which those messages are sent lack a

7  "domain name" and have no route, instead remaining within the

8  MySpace.com system.  The Court rejects these contentions.  The Court

9  must assume that Congress expressed the legislative purpose of a

10 statute through the ordinary meaning of the words used.  See Leisoni,

11 Inc. v. Stratman, 154 F.3d 1062, 1066 (9th Cir. 1998).  The plain

12 language of the definition of "electronic mail address" entails

13 nothing more specific than "a destination . . . to which an electronic

14 mail message can be sent," and the references to "local part" and

15 "domain part" and all other descriptors set off in the statute by

16 commas represent only one possible way in which a "destination" can be

17 expressed.  Indeed, the word "commonly" precedes the description of an

18 address with a domain part and local part, indicating that this

19 formulation is only one among many possible examples, rather than the

20 exclusive way in which the Act recognizes the expression of an

21 address.  As Defendant himself points out, at the time the Act was

22 passed in 2003, electronic messages could be sent in many ways,

23 including through "instant messaging," and the Court must presume that

24 Congress was well-aware of these various forms of electronic

25 communications when it drafted the Act.  The plain language of

26 "electronic mail address" encompasses these alternate forms while also

27 recognizing that the most commonly used form of electronic address was

28

1  the traditional "email" address with a local part and domain part

2  (i.e., "user@domain.com").  This expansive interpretation of the Act

3  supports the stated purpose of the Act, namely, curtailing the rapid

4  and detrimental growth of commercial electronic mail that has

5  overburdened electronic mail systems.  15 U.S.C. § 7701(a); see

6  MySpace, Inc. V. The Globe.com, Inc., Case No. 06-3391, 2007 WL

7  1514783, *4 (C.D. Cal. February 27, 2007) ("[T]he overarching intent

8  of this legislation is to safeguard the convenience and efficiency of

9  the electronic messaging system, and to curtail overburdening of the

10  system's infrastructure.").  To interpret the Act in the limited

11  manner as advocated by Defendant would conflict with the express

12  language of the Act and would undercut the purpose for which it was

13  passed.

14      Even under Defendant's more restrictive interpretation, however,

15  messages sent through MySpace.com fall within the definition of

16  "electronic mail message" sent to an "electronic mail address."  Each

17  MySpace.com user's mail resides on a unique URL, which includes a

18  string of characters containing the member's username and a reference

19  to the domain "myspace.com." (Whitcomb Decl. ¶ 4.)  MySpace.com

20  messages also contain header information, such as source, destination,

21  and routing information, and references to the unique username and the

22  myspace.com domain name.  (Id. ¶ 5.)  As the court in MySpace, Inc.

23  aptly stated in response to this precise argument, "[w]hile the

24  routing employed by MySpace may be less complex and elongated than

25  those employed by traditional [Internet service providers], any

26  routing necessarily implicates issues regarding volume of traffic and

27  utilization of infrastructure -- issues which CAN-SPAM seeks to

28

address." 2007 WL at *5. Therefore, even under Defendant's unduly
narrow interpretation, each MySpace.com message qualifies as an
"electronic mail message" sent to an "electronic mail address."
Plaintiffs may properly bring suit under the Act against Defendant.

    a.   § 7704(a)(1)

    Section 7704(a)(1) prohibits the use of false or misleading
header information, including header information that is "technically
accurate but includes an originating electronic mail address, domain
name, or Internet Protocol address the access to which for purposes of
initiating the message was obtained by means of false or fraudulent
pretenses or representations." 15 U.S.C. § 7704(a)(1)(A). "Header
information" is defined as "the source, destination, and routing
information attached to an electronic mail message, including the
originating domain name and originating electronic mail address, and
any other information that appears in the line identifying, or
purporting to identify, a person initiating the message." Id. §
7702(8). Plaintiff need not demonstrate a "pattern or practice" to
bring a claim under this subsection. Id. § 7706(g)(1).

    Plaintiff argues that Defendant violated this subsection by
obtaining 342,000 MySpace.com members' usernames and passwords through
the Wallace Websites that misleadingly and falsely resembled the log-
in page at MySpace.com. He then used this information to log into
those members' accounts and send 400,000 spam messages from those
accounts to other users. Plaintiff also argues that Defendant falsely
obtained over 11,000 "dummy" MySpace.com profiles to spam other
members, collect members' personal information, send commercial
messages, and post prohibited content, all in violation of the TOU

1  Contract.  Defendant claims that these allegations do not relate to

2  "headers" as required by this subsection, and even if they did, the

3  header information could not be altered or faked, so all the header

4  information was accurate.  Further, Defendant argues that a

5  MySpace.com member cannot "arbitrarily" send out messages, but rather

6  each recipient must be on that member's "friends" list, making it

7  impossible for Defendant to violate this subsection.

8       Defendant is correct that, whatever the means by which he _created_

9  11,000 MySpace.com profiles, this activity, in itself, did not involve

10 sending messages with header information and does not implicate

11 section 7704(a)(1).  The 400,000 messages Defendant sent via 340,000

12 other members' profiles, however, clearly violated this subsection.

13 In section 7704(a)(1)(A), Congress intended to prohibit not only

14 sending messages with _inaccurate_ header information, but also sending

15 messages with _accurate_ header information, access to which was

16 obtained through false or fraudulent pretenses.  _See_ Sen. Rep. No.

17 108-102 at 17 (2003) (stating that one purpose of section

18 7704(a)(1)(A) "is to eliminate the use of inaccurate originating email

19 addresses that disguise the identities of the senders.").  Here,

20 Defendant obtained access to other members' usernames and passwords by

21 creating websites that appeared nearly identical to the log-in page at

22 MySpace.com.  (Frazier Decl. ¶¶ 7-8, Exh. E.)  He then used that

23 information to "hijack" 340,000 member accounts to send out mass

24 commercial messages.  This clearly falls within the category of

25 messages prohibited where the header might be accurate but access to

26 the account from which it came was falsely and fraudulently obtained.

27 That messages could not be sent "arbitrarily" is irrelevant (and an

28

1 | inaccurate factual statement as discussed above) -- nothing in this

2 | subsection requires that messages must be sent "arbitrarily" and

3 | reading such a requirement into the statute would seriously undermine

4 | the efficacy of this subsection.  Therefore, Plaintiff has

5 | demonstrated a likelihood of success on its claim under section

6 | 7704(a)(1).

7 |                b.   <u>§ 7704(a)(3)</u>

8 |       Section 7704(a)(3) prohibits sending commercial electronic mail

9 | that does not contain a functioning return electronic mail address,

10 | active for at least 30 days following the date of the message, to

11 | which a recipient can send a request that no further messages be sent.

12 | 15 U.S.C. § 7704(a)(3)(A).  To bring a private cause of action under

13 | this subsection, Plaintiff must demonstrate a "pattern or practice" of

14 | prohibited conduct.  <u>Id.</u> § 7706(g)(1).  Plaintiff argues that

15 | Defendant violated this provision by sending messages from other

16 | users' accounts, so that any reply message sent by a user to decline

17 | further messages would go to the unwitting sender, not to Defendant.

18 | Defendant argues that a recipient can, in fact, reply to a message

19 | sent from another user because the messages contain information on the

20 | sender and the sender must be on the recipient's "friends" list to

21 | send the message in the first place.

22 |       Defendant again ignores the plain language of the Act.  The

23 | subsection requires that messages contain a functioning return

24 | electronic mail address to which a recipient can respond <u>to request no</u>

25 | <u>further messages</u>.  Defendant's use of "hijacked" profiles to send

26 | messages from a user other than Defendant completely eviscerates a

27 | recipient's ability to request no further messages from the <u>actual</u>

28 |

1  spammer.  Any request to stop sending messages would not go to the

2  individual responsible for the spam message, but rather, to an

3  unwitting sender who cannot control Defendant's surreptitious use of

4  their account.  Congress clearly intended this provision to enable

5  recipients of commercial spam to contact the spammer to curb further

6  spamming.  Interpreting it as advocated by Defendant would undercut

7  this purpose and encourage "hijacking" as an end-run around this

8  subsection.

9      Plaintiff asserts that Defendant's prohibited conduct under this

10  subsection amounted to a "pattern or practice" of violations and

11  Defendant makes no argument specifically refuting this contention.

12  The terms "pattern or practice" are undefined in the Act, but in other

13  contexts, the Ninth Circuit has stated that "these terms have their

14  ordinary meaning."  Cherosky v. Henderson, 330 F.3d 1243, 1246-47 (9th

15  Cir. 2003); see also United States v. Ironworkers Local 86, 443 F.2d

16  544, 552 (9th Cir. 1971) ("The words [pattern or practice] were not

17  intended to be words of art.").  One isolated act in violation of the

18  Act is insufficient.  See Omega World Travel, Inc. v. Mummagraphics,

19  Inc., 469 F.3d 348, 358 (4th Cir. 2006) (granting summary judgment on

20  section 7704(a)(3) claim because one violation did not demonstrate a

21  pattern or practice).  The evidence indicates that, beginning as early

22  as October 2006, Defendant began his activities to obtain MySpace.com

23  members' log-in information and to send out unsolicited emails.

24  (Frazier Decl. ¶¶ 2-3.)  Specifically, Plaintiffs offered evidence of

25  at least three separate "attacks" by Defendant using other members'

26  profiles to send commercial messages:

27      •    On March 27, 2007, Plaintiff's abuse team discovered that

28

Defendant used 328,303 profiles to send 392,726 unsolicited messages. (<u>Id.</u> ¶ 7.)

- On May 16, 2007, the abuse team discovered that Defendant used at least 5,306 user profiles to send 5,783 unsolicited messages. (<u>Id.</u> ¶ 9.)

- On May 20, 2007, the abuse team discovered that Defendant used 8,935 user profiles to send at least 10,125 unsolicited messages. (<u>Id.</u> ¶ 8.)

- Since Plaintiff filed its motion, the abuse team has discovered an additional 110,000 messages sent from 76,200 user accounts between May 10, 2007 and June 14, 2007. (Kaleel Supp. Decl. ¶ 11.)

This detailed record adequately demonstrates that Defendant has engaged in a pattern of violations sufficient under section 7706(g)(1) to support Plaintiff's private cause of action. Therefore, Plaintiff has demonstrated a likelihood of succeeding on its section 7704(a)(3) claim.

c. § 7704(a)(5)

Section 7704(a)(5) requires that all commercial electronic messages contain "clear and conspicuous identification that the message is an advertisement or solicitation," "clear and conspicuous notice of the opportunity to decline to receive further commercial electronic mail messages from the sender," and "a valid physical postal address of the sender." 15 U.S.C. § 7704(a)(5)(A). This provision also requires Plaintiff to demonstrate a pattern or practice of violations. <u>Id.</u> § 7706(g)(1).

Plaintiff claims that Defendant violated this provision with 400,000 messages that did not identify themselves as advertisements, did not contain notice of an opportunity to opt out of receiving further messages, and did not contain a physical address for Defendant. Plaintiff also argues that this information was absent

14

from messages sent from users' hijacked accounts.  Defendant argues
that the messages were not "commercial," but rather invitations to
view pictures, e-cards, or other non-commercial material, and even so,
the messages contained a MySpace.com return address.

The Act defines "commercial electronic mail message" as "any
electronic mail message the primary purpose of which is the commercial
advertisement or promotion of a commercial product or service
(including content on an Internet website operated for a commercial
purpose)."  15 U.S.C. § 7702(2)(A).  Regulations passed under the Act
further define the term "primary purpose" as "an electronic mail
message [that] consists exclusively of the commercial advertisement or
promotion of a commercial product or service[.]"  16 C.F.R
316.3(a)(1).  The plain language of this subsection indicates that
"commercial electronic mail messages" include messages that may not
themselves appear commercial, but that promote a "commercial service"
such as an "Internet website operated for a commercial purpose."  15
U.S.C. § 7704(a)(5)(A).  Although the Wallace Websites do not appear
to request any money directly from visitors and Defendant created the
websites to "provide fun, viral websites designed to motivate Internet
user[s] to refer their friends to view the content, sometimes called a
'tell-a-friend' service," (Wallace Decl. ¶ 3, Exh. C.), Defendant
admits that his "Internet business" earns him approximately $1 million
per year (Id. ¶ 15).  The record is silent as to how Defendant
specifically earns this revenue, but evidence on this point is
unnecessary.  The Court can readily infer that Defendant operates the
Wallace Websites, his "Internet business," to generate his $1 million
a year in revenue, and the facts demonstrate that he sent hundreds of

thousands of messages directing recipients to these websites. Therefore, these messages, even if not commercial on their face, promote an "Internet website operated for a commercial purpose" and are "commercial electronic mail messages" subject to the Act.

Defendant does not dispute that the messages did not contain "clear and conspicuous identification that the message is an advertisement or solicitation," "clear and conspicuous notice of the opportunity to decline to receive further commercial electronic mail messages from the sender," and "a valid physical postal address of the sender."  Further, even if the messages Defendant sent from "hijacked" accounts contained a return address, that address would be wholly ineffective to allow the recipient to "opt out" of receiving further messages since Defendant -- the one engaging in the commercial solicitation -- would never receive those requests.  Finally, as discussed above, the evidence submitted by Plaintiff demonstrates a pattern of acts that violate this subsection.  Therefore, Plaintiff has demonstrated a likelihood of success on the merits of its claim under section 7704(a)(5).

    d. <u>Section 7704(b)(2)</u>

Section 7704(b)(2) prohibits a person from using "scripts or other automated means to register for multiple electronic mail accounts or online user accounts from which to transmit . . . a commercial electronic mail message that is unlawful under subsection (a)" of section 7704.  15 U.S.C. § 7704(b)(2).  Showing a pattern or practice under this provision is unnecessary to maintain a private cause of action.  <u>Id.</u> § 7706(g)(1).  Plaintiff argues that the Court should infer a violation of this section because the naming

1  conventions used in creating 11,000 separate profiles were consistent,
2  including 2,077 profiles named "What Pic Should I Upload?", as were
3  the naming conventions in the underlying America Online email
4  addresses.  (Kaleel Decl. ¶¶ 16-18.)  Defendant argues that Plaintiff
5  has presented no evidence that he used a "bot" to register these
6  profiles and in any event, each registration requires the user to
7  input a unique set of characters designed to be unreadable to an
8  automated program, and Plaintiff has not offered any evidence on how
9  such an automated script could be written.
10      Plaintiff need not necessarily provide direct evidence that
11 Defendant used an automated bot for registration, but it must provide
12 evidence sufficient for the Court to infer such use, and Plaintiff has
13 failed to do so.  Plaintiff's only evidence is the creation of 11,000
14 profiles, 2,000 of which share the same name, and all of which were
15 registered using similar America Online email addresses.  These facts
16 do not necessarily compel the conclusion that Defendant used an
17 automated bot.  For example, Plaintiff has not provided evidence of
18 the time frame in which the 11,000 profiles were created, which is
19 crucial because, assuming registration of a new profile takes only one
20 minute (which is conservative given that the user must input a name,
21 country, zip code, birth date, gender, an email address, and a unique
22 verification code, as well as create a password and agree to the TOU
23 Contract), one person could spend 23 eight-hour days, without breaks,
24 to create 11,000 profiles.  While this may seem unrealistic, Defendant
25 could also have hired others to assist in this registration process,
26 substantially reducing the time and effort needed from a single
27 person.  On the other hand, evidence that the registration of the
28

                                    17

1   11,000 profiles occurred over a matter of hours or even days would

2   greatly strengthen any inference that the registration was done with

3   an automated bot.

4       Moreover, Plaintiff has provided no evidence that an automated

5   bot could circumvent the verification step in the registration

6   process, a security measure used by Plaintiff to stop automated

7   registration.  Plaintiff suggests instead that Defendant could have

8   used an automated bot to complete all steps up to the verification

9   code step.  While this may be true, and the Court certainly would not

10  require Plaintiff to disclose trade secrets or outline the specific

11  steps to circumvent its security measures to prove this point, the

12  record is devoid of any testimony that this type of automated bot

13  exists or has been used in the past.  Defendant, on the other hand,

14  testified that he has no knowledge of any automated script that could

15  circumvent this security measure.  (Wallace Decl. ¶ 9.)  The Court

16  recognizes that at the preliminary stage the evidentiary burden is

17  relaxed, see <u>Flynt Distrib. Co. v. Harvey</u>, 734 F.2d 1389, 1394 (9th

18  Cir. 1984), but the evidence in the record at this time is simply

19  insufficient to demonstrate that Plaintiff will likely prevail on the

20  merits of its claim under this subsection.

21      **B.    Irreparable Harm**

22      Plaintiff claims it has been irreparably harmed by Defendant's

23  activities because Defendant's messages have clogged the MySpace.com

24  network, used up bandwidth, and degraded the user experience.  (Kaleel

25  Decl. ¶¶ 11-12.)  This has resulted in delivery-related costs, and

26  costs associated with devoting time, money, and resources to stop

27  Defendant's activities.  (Kaleel Decl. ¶ 21.)  Moreover, Plaintiff's

28

reputation and business goodwill have suffered, manifested by 800

complaints lodged by users over Defendant's activities.  (Frazier

Decl. ¶ 15.)[2]

Harm to business goodwill and reputation is unquantifiable and

considered irreparable.  See Rent-A-Center, Inc. v. Canyon Tele. &

Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) ("Intangible

injuries, such as damage to ongoing recruitment efforts and goodwill,

qualify as irreparable harm."); Optinrealbig.com, LLC v. Ironport

Sys., Inc., 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) ("Damage to a

business's goodwill is typically irreparable injury because it is

difficult to calculate.").  Plaintiff has incurred substantial costs

in detecting, investigating, and remedying Defendant's unsolicited

messages, including removing over 290,000 unauthorized links and over

890,000 comments throughout the MySpace.com site.  (Frazier Decl. ¶¶

13-14.)  Moreover, Plaintiff has received 800 complaints about

Defendant from users.  While that may only amount to one complaint for

every thousand unsolicited messages, this is still a substantial

number and constitutes injury to Plaintiff's goodwill.  (Kaleel Supp.

Decl. ¶ 8); see Compuserve Inc. v. Cyber Promotions, Inc., 962 F.

Supp. 1015, 1023 (S.D. Ohio 1997) (finding that Defendant Wallace

inflicted harm to plaintiff's business reputation and goodwill by

causing subscribers to terminate their accounts).  Further, the Court

---

[2]Plaintiff also argues that, since users as young as fourteen
years old can create profiles on MySpace.com, Defendant's activities
create the risk that minors using MySpace.com might view adult
material contained on the Wallace Websites.  (Frazier Decl. ¶ 8, Exh.
G; Kaleel Decl. ¶ 14.)  Defendant disputes this contention.  The Court
need not address this point since Plaintiff sufficiently demonstrated
irreparable harm through the other evidence it has submitted.

1  cannot expect every user to complain about every piece of spam
2  received, since users would spend as much time responding to spam as
3  they would responding to non-spam messages.  See 15 U.S.C. § 7701(2)
4  ("Unsolicited commercial electronic mail is currently estimated to
5  account for over half of all electronic mail traffic . . .").
6  Moreover, Defendant's misleading suggestions that he is affiliated
7  with Plaintiff impacts the quality of MySpace.com users' experiences
8  with Plaintiff's services.  See Hotmail Corp. v. Van$ Money Pie Inc.,
9  47 U.S.P.Q.2d 1020, 1025-26 (N.D. Cal. 1998) (finding irreparable harm
10  where defendants caused customer confusion by suggesting they were
11  associated with plaintiff); Meineke Car Care Centers, Inc. v.
12  Quinones, 2006 WL 1549708, *3 (W.D.N.C. 2006) (finding that lost
13  customers resulting from defendants' deceptive suggestion that they
14  were associated with plaintiff constituted irreparable harm).[3]  For
15  these reasons, Plaintiff has persuasively demonstrated irreparable
16  harm from Defendant's unlawful activities.

17  **C.   Balance of Hardships and Public Interest**

18  The balance of hardships tips sharply in favor of Plaintiff here.
19  Plaintiff has already expended substantial time and money in combating
20  Defendant's unsolicited messages and postings, and has dealt with over
21  800 resulting user complaints.  Moreover, Plaintiff has discovered

22  _____

23  [3]Defendant distinguishes Hotmail Corp. on the ground that it
   involved a claim for trademark infringement.  Although that is true,
24  the irreparable harm inquiry is not dependent on the claims asserted,
   but rather the harm suffered as a result of the defendant's allegedly
25  unlawful actions.  Here, Defendant caused confusion by using the
   MySpace.com logo and log-in box to deceive users into providing their
26  log-in information.  This activity creates the same risk of harm as in
   Hotmail Corp. -- the potential loss of customers -- and therefore the
27  court's analysis in that case is equally applicable here.

28

1  further evidence that Defendant's actions have continued even after
2  Plaintiff filed the instant motion, discovering yet another group of
3  110,000 messages sent from 76,200 user accounts between May 10, 2007
4  and June 14, 2007.  (Kaleel Supp. Decl. ¶ 11.)  Plaintiff also
5  suggests that, short of an injunction, it would experience difficulty
6  in curbing Defendant's activities by, for example, blocking
7  Defendant's Internet Protocol addresses, without also curbing other
8  users' legitimate use.  (Kaleel Supp. Decl. ¶ 5.)  Even if it blocked
9  his IP addresses, he could modify his equipment and tactics to
10  circumvent this security measure.  See, e.g., Compuserve Inc., 962 F.
11  Supp. at 1019 (stating that, in response to software programs blocking
12  Defendant Wallace and his company's messages, they "have modified
13  their equipment and the messages they send in such a fashion as to
14  circumvent Compuserve's screening software.").  In contrast, as
15  outlined above, Defendant's actions likely violate the CAN-SPAM Act
16  and he would experience no hardship if enjoined from committing any
17  further violations.  See Phillip Morris USA Inc. v. Shalabi, 352 F.
18  Supp. 2d 1067, 1075 (C.D. Cal. 2004).
19      The public interest is also served through enjoining Defendant's
20  unlawful activities.  In passing the CAN-SPAM Act, Congress recognized
21  the significant costs and burden associated with the nearly unchecked
22  growth of commercial spam.  15 U.S.C. § 7701.  "[B]arraging the public
23  with spam" injures the public such that the public "is forced to incur
24  the costs of needlessly expended energy and time evaluating and
25  eventually discarding defendants' unsolicited messages[.]"  F.T.C. v.
26  Phoenix Avatar, LLC, 2004 WL 1746698, *14 (N.D. Ill. 2004) (enjoining
27  violations of the CAN-SPAM Act).  Because Defendant's activities fall

28

21

1  squarely within those activities Congress found detrimental to the

2  public in the CAN-SPAM Act, this factor strongly weighs in favor of

3  Plaintiff.

4  **IV. SCOPE OF INJUNCTION**

5       Defendant challenges Plaintiff's proposed injunction as too

6  broad, sweeping in Defendant's legitimate activities along with any

7  alleged unlawful ones.  Plaintiff's proposed injunction seeks to

8  enjoin Defendant from the following:

9       (a) "accessing or using the MySpace.com website, MySpace Internet
        messaging service and/or any other services offered by or through
10      MySpace (the 'MySpace Service') to directly or indirectly send or
        transmit any electronic communications, emails or instant
11      messages to any MySpace user or MySpace account or to post
        comments or bulletins";

12      (b) "establishing or maintaining MySpace profiles or accounts";

13
        (c) "using the MySpace Service for a commercial purpose";
14
        (d) "referring in any way to MySpace in connection with any
15      unsolicited commercial electronic communication, email or
        instant message";
16
        (e) "using any automated scripts, bots, or other executable
17      programs in connection with any MySpace account or the
        MySpace service or providing such programs to third parties
18      for use on the MySpace Service";

19      (f) "soliciting, requesting, or taking any action to induce
        a MySpace user to provide identifying information, including
20      MySpace account information such as a username and/or
        password"; and
21
        (g) "using another MySpace user's identifying information,
22      including MySpace account information such as username
        and/or password";
23
        (h) "referencing MySpace in connection with any
24      advertisements []"; and

25      (i) "[encouraging], facilitating, enabling or inducing any
        person or entity to do any of the above in violation of the
26      CAN SPAM Act, 15 U.S.C. § 7701 et seq. and California
        Business & Professions Code §§ 17529.5, 17200 et seq., 17500
27      et seq., and 22948."

28                                    22

1    Defendant argues that subsections (d) and (h) sweep in legitimate
2  commercial speech in violation of his First Amendment rights.
3  Plaintiff refutes this claim by citing two cases to suggest that
4  courts have rejected Defendant's First Amendment arguments in similar
5  circumstances.  See Cyber Promotions v. America Online, Inc., 948 F.
6  Supp. 436, 455 n.7 (E.D. Pa. 1996); Compuserve, 962 F. Supp. at 1024.
7  Plaintiff, however, misinterprets the opinions in both America Online
8  and Compuserve.  In America Online, the court specifically limited its
9  discussion to activities on the America Online site, not on the
10  Internet, stating that "AOL has never sought to control the exchange
11  of ideas and communications over the Internet itself.  Rather, AOL has
12  sought to control its own pathway or channel leading to the Internet
13  in order [to] protect its own private property, reputation and
14  subscribers from Cyber's mass email advertisements."  948 F. Supp. at
15  454-455.  Similarly, in Compuserve, the court's analysis centered on
16  "Defendant's use of plaintiff's proprietary computer equipment," not
17  on regulating the channels of speech on the greater Internet.  962 F.
18  Supp. at 1027.

19    The Court finds that subsections (d) and (h) are, in fact, too
20  broad, risking infringement of Defendant's legitimate commercial and
21  non-commercial speech activities outside Plaintiff's proprietary
22  MySpace.com site and beyond the limitations upheld in America Online
23  and Compuserve.  Defendant has a legitimate First Amendment right to
24  mention Plaintiff, even in commercial solicitation messages, so long
25  as recipients are not misled into believing that Defendant is somehow
26  associated with or speaking for Plaintiff.  For example, Defendant has
27  the right, in any commercial message, to engage in critical discussion

28

1 of Plaintiff, Plaintiff's lawsuit against him, or to truthfully
2 discourage recipients from utilizing Plaintiff's services.  As both
3 subsections (d) and (h) are currently drafted, Defendant could not
4 engage in this speech and enjoining Defendant consistent with these
5 provisions would, in fact, violate Defendant's free speech rights.

6     Subsections (f) and (g) also risk curbing the legitimate
7 activities of third parties.  As they are drafted, subsections (f) and
8 (g) would preclude Defendant from obtaining fully informed, knowing,
9 and voluntary consent from MySpace.com members so that Defendant might
10 log on to their accounts and disseminate messages (commercial or
11 otherwise).  Although the record does not reflect that any member has
12 (or would) consent to such a use of his or her account, this
13 possibility exists and the Court cannot enjoin this legitimate choice
14 by members, so long as Defendant fully informs them that he is not
15 affiliated with or sanctioned by Plaintiff, and that he intends to use
16 that information to log in to their MySpace.com accounts and
17 disseminate messages to other MySpace.com users.  Therefore,
18 subsections (f) and (g) are too broad.

19     Further, the Court cannot enjoin Defendant based on subsection
20 (e) because, as discussed above, the Court finds that Plaintiff has
21 not demonstrated a likelihood of success on the merits of its section
22 7704(b)(2) claim.  The Court notes that omitting this subsection of
23 the proposed injunction on this basis may have little practical effect
24 since subsection (b) prevents Defendant from establishing MySpace.com
25 accounts or profiles by any means, including through automated bots.
26     The remaining provisions (a), (b), and (c) relate specifically to
27 Defendant's use of Plaintiff's space, equipment, and property.  As

28

1  Plaintiff points out, MySpace.com is a private site, the use of which

2  is a privilege, and Defendant has repeatedly demonstrated his

3  inability to comply with Plaintiff's rules of use or with federal law

4  when using Plaintiff's services.  Therefore, these provisions validly

5  prevent Defendant from abusing the privilege of using Plaintiff's

6  services and are adequate in scope to fulfill this purpose.[4]

7  **V.   BOND**

8      Federal Rule of Civil Procedure 65(c) requires Plaintiff to post

9  a bond, in a sum the Court deems appropriate, for the payment of costs

10 and damages that Defendant may suffer if he is later found to have

11 been wrongfully enjoined.  While the Court recognizes that a bond may

12 not be required when the harm to the enjoined party is minimal, <u>see,</u>

13 <u>e.g.</u>, <u>Jorgensen v. Cassiday</u>, 320 F.3d 906, 919 (9th Cir. 2003), the

14 Court retains discretion to require a bond when the party seeking the

15 injunction has not offered evidence of its own harm in posting a bond,

16 <u>see</u> <u>Barahona-Gomez v. Reno</u>, 167 F.3d 1228, 1237 (9th Cir. 1999).

17 Plaintiff has argued only that an injunction would impose no hardship

18 on Defendant, not that Plaintiff itself will suffer some harm in

19 posting a bond.  Plaintiff requests a bond of $1 million, but the

20 Court finds that a bond for this amount is unnecessary.  Therefore,

21 the Court ORDERS Plaintiff to post a bond in the amount of $50,000.

22 **VI.   CONCLUSION**

23     Plaintiff has demonstrated a likelihood of success on the merits

24

25     [4]The Court notes that subsection (i) is necessary to the extent
   that it enjoins Defendant from directing others to undertake
   activities that he is prohibited from undertaking, although referring
26 to the specific statutory provisions at issue is unnecessary because
   the other parts of the injunction clearly delineate the prohibited
27 conduct.

28

of its claims under the CAN-SPAM Act, 15 U.S.C. § 7704(a)(1), (a)(3), and (a)(5), but has not offered sufficient evidence to demonstrate a violation of section 7704(b)(2).  Plaintiff has also demonstrated irreparable harm to its business goodwill and reputation if Defendant continues his unlawful activities, the balance of hardships tips in its favor, and the public interest is served by enjoining Defendant's conduct.

Therefore, the Court ENJOINS Defendant, his agents, servants, employees, representatives, and all other persons or entities acting on his behalf or in concert or participation with him, from[5]:

(1) accessing or using the MySpace.com website, MySpace Internet messaging service and/or any other services offered by or through MySpace (the 'MySpace Service') to directly or indirectly send or transmit any electronic communications, emails or instant messages to any MySpace user or MySpace account or to post comments or bulletins;

(2) establishing or maintaining MySpace profiles or accounts;

(3) using the MySpace Service for a commercial purpose;

(4) referring to MySpace in connection with any unsolicited commercial electronic communication, email or instant message, in any way that falsely or fraudulently suggests that such message was approved by, generated by, or is in any way affiliated with MySpace;

(5) using any MySpace logo or using any graphic, interface, or other presentation that approximates or resembles the MySpace.com log-in page to mislead users into believing that they are logging onto their MySpace.com accounts rather than providing Defendant with their username and password;

(6) inducing a MySpace user to provide MySpace identifying information, including MySpace account information such as a username and/or password, without first informing the user the Defendant is not affiliated with or sanctioned by MySpace and without obtaining fully informed, knowing, and voluntary consent through a separate affirmative step by the

_____

[5]These provisions incorporate a combination of Plaintiff's proposed provisions and the Court's limitations as outlined _supra_.

user; and

(7) encouraging, facilitating, enabling or inducing any person or entity to do any of the above.

Plaintiff is ORDERED to post a bond in the amount of $50,000 **within ten (10) days of the date of this Order**. Plaintiff is also ORDERED to prepare a proposed order consistent with this Order, including findings of fact and conclusions of law, **within ten (10) days of the date of this Order**.

**IT IS SO ORDERED.**

DATED:  July 2, 2007

AUDREY B. COLLINS
UNITED STATES DISTRICT JUDGE

27