GREENBERG TRAURIG, LLP
IAN C. BALLON (SBN 141819)
WENDY M. MANTELL (SBN 225544)
LORI CHANG (SBN 228142)
NINA D. BOYAJIAN (SBN 246415)
2450 Colorado Avenue, Suite 400E
Santa Monica, California  90404
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Email:  ballon@gtlaw.com, mantellw@gtlaw.com

Attorneys for Plaintiff
MYSPACE, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MYSPACE, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SANFORD WALLACE D/B/A FREEVEGASCLUBS.COM, REAL-VEGAS-SINS.COM, and FEEBLE MINDED PRODUCTIONS, an individual; WALTER RINES, an individual; ONLINE TURBO MERCHANT, INC., a corporation; and ODYSSEUS MARKETING, INC., a corporation,<br><br>Defendants. | CASE NO. CV-07-1929 ABC (AGRx)<br><br>**PLAINTIFF MYSPACE, INC.'S NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENTS AGAINST DEFENDANTS SANFORD WALLACE AND WALTER RINES; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**Filed Concurrently With:**<br>**Declaration of Lori Chang;**<br>**Declaration of Shing Yin Khor;**<br>**Declaration of Kevin Datoo;**<br>**Declaration of Joseph Marotta; and**<br>**[Proposed] Order.**<br><br>Date:  May 12, 2008<br>Time:  10:00 a.m.<br>Ctrm:  680<br>Judge:  Hon. Audrey B. Collins |

**TO ALL PARTIES:**

PLEASE TAKE NOTICE that on May 12, 2008, at 10:00 a.m., in courtroom 680 of the above-captioned court, located at 255 East Temple Street, Los Angeles, California, Plaintiff MYSPACE, INC. ("MySpace") will and hereby does move for a default judgments against defendants Sanford Wallace and Walter Rines for (1) statutory damages for violations of the CAN-SPAM Act in the amounts of $157,390,200 against defendant Wallace and $233,777,500 against defendant Rines ($157,390,200 in joint and several liability and an additional $63,387,300 award against Rines), plus statutory damages for violations of Cal. Bus. & Prof. Code § 22948.2 in the amount of $1,500,000; or *in the alternative*, liquidated damages for breach of contract in the amounts of $70,731,700 against defendant Wallace and $81,296,250 against Rines (representing joint and several liability of $70,731,700 and separate liability of $10,564,550), plus statutory damages for violations of Cal. Bus. & Prof. Code § 22948.2 in the amount of $1,500,000, and punitive damages for unfair competition in the amount of $25,000,000; (2) a permanent injunction pursuant to Fed. R. Civ. P. 65 in the form attached as a proposed order; and (3) attorneys' fees in an amount pursuant to the schedule set forth in Local Rule 55-3, and costs of suit.

This Motion is made on the grounds that:

1.     Pursuant to the court's Order entered on April 16, 2008, default was entered against Sanford Wallace.

2.     A default against Mr. Rines was entered by the clerk on November 28, 2007. Pursuant to the court's Order authorizing alternative service via certified mail and email, entered on September 25, 2007, Walter Rines was served with a Summons and the First Amended Complaint in this action.  Mr. Rines failed to appear in this case.

3.     The defendants are not infants, incompetent, in military service or otherwise exempted from default judgment under the Soldiers and Sailors' Civil Relief Act of 1940;

4.   Notice of the amount requested by MySpace in judgment has been made to defendants concurrently with the filing of this motion;

5.   Default judgments in favor of MySpace against defendants is justified in light of the substantive merits of MySpace's claims, the sufficiency of MySpace's First Amended Complaint, the amount of money at stake in this action, the possibility of prejudice to MySpace if relief is denied, the lack of any possible dispute with respect to any material facts in the case, and the fact that defendants' respective defaults did not result from excusable neglect.

MySpace seeks statutory damages in an amount certain for violations of the CAN-SPAM Act (15 U.S.C. §§ 7701 *et seq.*); or in the alternative, liquidated damages for breach of contract as set forth in the agreement assented to by the defendants, plus punitive damages for unfair competition.  MySpace also seeks statutory damages in an amount certain for violations of Cal. Bus. & Prof. Code §22948.2.

MySpace further seeks attorneys' fees pursuant to the CAN-SPAM Act (15 U.S.C. § 7706(g)(4)), the Lanham Act (15 U.S.C. § 1117(b)), California Business & Professions Code §§ 17529.8(1)(2), 22948.3(c)(2), and 17200 *et seq.*, and MySpace's Terms Of Use Contract.

In addition, MySpace is entitled to a permanent injunction that prohibits defendants from engaging in the activities enjoined in the court's Order modifying the preliminary injunction order, entered on October 16, 2007, in the proposed form submitted with this motion.

This Motion is based upon the orders entering default against both defendants, the attached Memorandum of Points and Authorities, and the Declarations of Lori Chang, Shing Yin Khor, Kevin Datoo, and Joseph Marotta, and all Exhibits thereto submitted concurrently with this Motion and Memorandum, the orders and pleadings on file in this matter, and any arguments made at the hearing on this Motion.

DATED:  April 18, 2008          GREENBERG TRAURIG, LLP


By _____
     IAN C. BALLON
     WENDY M. MANTELL
     LORI CHANG
     NINA D. BOYAJIAN

     Attorneys for Plaintiff
     MYSPACE, INC.

MYSPACE'S MOTION FOR DEFAULT JUDGMENTS AGAINST DEFENDANTS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

MySpace, Inc. ("MySpace") seeks entry of default judgments against defendants Sanford Wallace and Walter Rines (collectively, "defendants") for unlawful phishing and spamming on MySpace's network in violation of MySpace's Terms Of Use contract, the CAN-SPAM Act (15 U.S.C. §§ 7701 *et seq*.), the Lanham Act (15 U.S.C. §§ 1051 *et seq*.), and multiple provisions of California Business & Professions Code. By the court's order, the clerk entered default against Rines on November 28, 2007, for failing to appear in this case or otherwise respond to MySpace's complaint ("FAC"). *See* Declaration of L. Chang ("Chang Decl."), filed concurrently herewith, Ex. 3.[1]  On April 16, 2008, the court entered default against Wallace as a discovery sanction for failing to appear at his third-noticed, second court-ordered deposition.[2]  *See id.*, Ex. 4.

MySpace seeks statutory damages for violations of the CAN-SPAM Act in the amounts of $157,390,200 against defendant Wallace and $233,777,500 against defendant Rines ($157,390,200 in joint and several liability and an additional $63,387,300 in statutory damages); or *in the alternative*, liquidated damages for violations of MySpace's Terms Of Use Contract in the amounts of $70,731,700 against defendant Wallace and $81,296,250 against Rines (representing joint and several liability of $70,731,700 and separate liability of $10,564,550), plus $25,000,000 in punitive damages for unfair competition. In addition, MySpace seeks statutory damages for violations of Cal. Bus. & Prof. Code § 22948.2 in the amount of $1,500,000. A substantial damage award is

---

[1] Rines was properly served pursuant to this court's order entered on September 25, 2007, authorizing alternative service of the summons and FAC on Rines by means of certified mail and email. *See* Chang Decl. ¶¶ 2-3 and Exs. 1-2. Pursuant to this order, service was complete upon the emailing and mailing of these documents. *Id.*, Ex. 1.

[2] Since the court issued the preliminary injunction, Wallace effectively withdrew from the lawsuit. He has not opposed any subsequent motions brought by MySpace, including three discovery motions, or responded to written discovery requests. He has also flouted two court orders compelling discovery; and more recently refused to even communicate with counsel for MySpace, despite numerous attempts to engage him in a dialogue.

supported by law, and is especially appropriate here, where defendants are repeat offenders who have earned millions of dollars by illegally generating traffic from MySpace, and caused MySpace actual economic and reputational harm that, while substantial, is difficult to measure. Defendants began their illegal activities on MySpace in the same month a permanent injunction was entered in a case brought by the FTC, enjoining them from engaging in unlawful phishing, among other things. (The FTC subsequently filed a contempt motion against defendants based upon evidence presented by MySpace in this case. *See* Chang Decl., Exs. 7, 9.) Rines, Wallace's business partner, continued to spam MySpace even after this court issued a preliminary injunction ("PI Order," attached as Chang Decl., Ex. 10) that expressly enjoined all persons "acting on [Wallace's] behalf or in concert or participation with [him]" from, *inter alia*, spamming and phishing on MySpace.[3] Defendants perpetrated these acts with no regard for the orders handed down by this court and other jurisdictions. A substantial damages award -- whether or not MySpace will ever be able to collect on it[4] -- is justified to punish and deter Wallace (the self-proclaimed "King of Spam") and Rines, who have both acted as if they were above the law, from future misconduct. A substantial award is also necessary to deter others from engaging in similar misconduct.

A substantial award is proper because there is ample evidence to support the merits of MySpace's well-pleaded claims in the FAC. In issuing the PI Order, the court already

---

[3] *See generally* MySpace, Inc.'s Motion To Modify The Court's Preliminary Injunction Order, filed on October 1, 2007. Even though Rines was not a named defendant at the time the Court issued the PI Order, MySpace sent Rines a cease and desist letter notifying him of the PI Order. *See* Declaration of Wendy Mantell in support of MySpace's *Ex Parte* Application (1) For Leave To File Amended Complaint And (2) To Authorize Alternative Service On Defendant Walter Rines, filed on September 17, 2007 ("Mantell Decl."), Ex. H. Rines, therefore, had actual notice of the PI Order.

[4] Indeed, Wallace never paid MySpace $150 as ordered by the Magistrate Judge upon MySpace's second motion for discovery sanctions. *See generally* Declaration Of Lori Chang In Support Of Plaintiff MySpace, Inc.'s Third Motion For Fed. R. Civ. Proc. 37 Sanctions Against Defendant Sanford Wallace, filed on January 22, 2008.

2

determined that defendants engaged in unlawful spamming on MySpace through the use of hijacked accounts and that MySpace had been irreparably harmed from these actions. *See MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293 (C.D. Cal. 2007); Order granting MySpace, Inc.'s Motion to Modify the Court's Preliminary Injunction Order, entered on October 16, 2007 (Chang Decl., Ex. 11).

Further, the Court can reasonably infer liability from defendants' deliberate refusal to participate in this lawsuit. After the PI Order was issued, Wallace, an experienced litigant who has been sued for spamming multiple times before, ignored MySpace's discovery requests, failed to oppose its three motions for sanctions or abide by court orders, and eventually rebuffed all attempts to contact him and elected to no longer participate in this action.[5] Rines, likewise, had actual knowledge of this lawsuit and PI Order, instructed his counsel in the FTC action not to respond to MySpace's attempts to subpoena him for a deposition, and then skipped town right after MySpace sent him a cease and desist letter.[6] Defendants knew and understood the consequences of this lawsuit, but defiantly chose to ignore them.

## II.   STATEMENT OF FACTS

### A.   Defendants' Unlawful Spamming And Phishing Directly Harm MySpace

MySpace is a social networking service that provides for its members a community built entirely upon online communication. FAC ¶ 10. Through MySpace, members communicate with each other by sending emails, posting "comments," sending "bulletins," or creating "groups" with web pages that provide common message boards for members who join such groups.[7] *See id.*; Declaration of S. Kaleel in support of PI

---

[5] *See generally* Plaintiff MySpace, Inc.'s Third Motion For Fed. R. Civ. Proc. 37 Sanctions Against Defendant Sanford Wallace, filed on January 22, 2008.

[6] *See* Mantell Decl., previously filed on September 17, 2007, ¶¶ 11-13, Exs. L, M.

[7] **Comments** are messages posted on a user's profile page section of a member's profile that can be read by anyone visiting this profile. **Bulletins** are messages posted by a member on his or her "bulletin board." Bulletins are sent en masse to all of the member's friends, and are viewable only by the recipients. Kaleel Decl. ¶¶ 7-8.

3

1  Motion ("Kaleel Decl.") (Chang Decl., Ex. 12) ¶ 3.  These messages can only be created,

2  sent and received by MySpace members who, upon registration, are each given an

3  individual MySpace email account that is assigned with a unique URL and displayed on

4  MySpace through a personal profile page created by the member.  Kaleel Decl. ¶¶ 3, 6.

5         Spamming and phishing are activities that hinder online communication and

6  degrade users' overall experience on MySpace.  Kaleel Decl. ¶ 11.  These activities are

7  illegal, but also prevalent.  *See* 15 U.S.C. § 7701 ("The convenience and efficiency of

8  electronic mail are threatened by the extremely rapid growth in the volume of unsolicited

9  commercial electronic mail.").  MySpace employs extensive anti-abuse measures and

10  strictly prohibits spamming, among other things, in its TOU Contract.  *See* Kaleel Decl.,

11  Exs. B, C, at p. 4 (¶ 8.9) (prohibiting "the transmission of...unsolicited mass mailing, or

12  'spamming.'"); FAC ¶ 11.

13  **B.    MySpace's Extensive Efforts To Prevent Abuse**

14         MySpace personnel expend significant time and resources to minimize abuse on

15  the MySpace.com website, including disruptions caused by spam.  *See* FAC ¶¶ 11, 31-33.

16  MySpace monitors email accounts with high traffic volume, responds to member

17  complaints, contacts spammers and other abusers to demand that they cease their

18  activities, and identifies and terminates accounts used for abuse. Kaleel Decl. ¶ 13.

19         MySpace also implements technical and other measures to combat spamming,

20  phishing, and other abuse.  For example, MySpace limits the number of email messages

21  that can be sent from a single MySpace.com email account in a single day.  *Id.* ¶ 12.

22  MySpace also uses sophisticated algorithms to identify potential spammers and acts

23  quickly to review potential spammers' email accounts, deleting those accounts where

24  appropriate in order to ensure that the MySpace network is not used to transmit

25  unsolicited commercial email, or spam.  *Id.*

26  **C.    MySpace's Terms Of Use Contract Prohibits Spamming And Phishing**

27

28

The MySpace Terms of Use Contract ("TOU Contract") governs any use of the MySpace service, whether by a member (someone who has registered with MySpace.com) or a visitor (one who simply browses the website).  FAC ¶ 15 and Ex. A; Kaleel Decl., Exs. B, C.  To become a MySpace member and create a profile, users must assent to the TOU Contract.  FAC ¶ 15; *see also* Kaleel Decl. ¶ 4.

The TOU Contract expressly prohibits spamming, phishing, and other abusive tactics that enable these activities.[8]   Both Wallace and Rines have registered as MySpace members and therefore assented to the terms of the TOU Contract.  Rines FTC Dep. Tr. (Chang Decl., Ex. 5), 82:17-18 (admitting to have a MySpace account); Declaration of S.

---

[8] Specifically, the TOU Contract prohibits:

- "the transmission of…unsolicited mass mailing,…or 'spamming'" (Kaleel Decl., Exs. B, C at p. 4 (¶ 8.9));
- posting content that "contains nudity, violence, or offensive subject matter or contains a link to an adult website" (*id.* (¶ 8.4));
- "any automated use of its system, such as using scripts," bots, or other executable programs (*id.* at p. 5 (¶ 4));
- "using the account, username, or password of another Member" (*id.* (¶ 8));
- "collecting usernames and/or email addresses of Members by electronic or other means for the purpose of sending unsolicited email" (*id.* at p. 2 (¶ 5));
- "solicit[ing] passwords or personal identifying information for commercial or unlawful purposes from other Users" (*id.* at p. 4 (¶ 8.12));
- "solicit[ing] personal information from anyone under 18," (*id.* (¶ 8.5));
- "attempting to impersonate another Member or person" (*id.*, at p. 5 (¶ 6));
- using the MySpace Services "in connection with any commercial endeavors except those that are specifically endorsed or approved by MySpace.com," including advertisements, affiliate links, and other forms of solicitation (*id.* at p. 2 (¶ 5));
- "advertising to, or solicitation of, any Member to buy or sell any products of services through the MySpace Services" (*id.* at p. 5 (¶ 2));
- "covering or obscuring the banner advertisements on . . . any MySpace.com page via HTML/CSS or any other means" (*id.* (¶ 3));
- "interfering with, disrupting, or creating an undue burden on the MySpace Services or the networks or services connected to the MySpace Services" (*id.* (¶ 5)); and
- "using the MySpace Services in a manner inconsistent with any and all applicable laws and regulations" (*id.* at p. 6 (¶ 12)).

Wallace ("Wallace Decl.") filed in opposition to PI Motion (Chang Decl., Ex. 17) ¶ 2 ("I am a MySpace user with a profile for my club"); FAC ¶¶ 18, 75.  As discussed below in section D, defendants, have nonetheless violated numerous material provisions.

## D.   Defendants Engaged In Unlawful Spamming And Phishing On MySpace.com

Defendants earn revenue by driving traffic to commercial websites through spamming MySpace.com and its members in violation of both federal and state laws, and the TOU Contract.  Defendants' spam messages drive users intentionally or without their knowledge to websites that they control or which pay them money for doing so.  In this case, defendants drove traffic to www.freevegasclubs.com, www.real-vegas-sins.com, www.getbiggiecised.com, and www.stop-passing-gas.com ("Defendants' Websites"). FAC ¶ 17; Declaration of I. Ballon in support of PI Motion ("Ballon Decl.") (Chang Decl., Ex. 16), Ex. D; Declaration of J. Wiley in support of PI Motion ("Wiley Decl.") (Chang Decl., Ex. 14) ¶ 4.  Defendants' Websites in turn promote other commercial vendors such as Ringtones.net and Fling.com, an adult website that displays nudity and quasi-pornographic content.  *See* Declaration of R. Frazier in support of PI Motion ("Frazier Decl.") (Chang Decl., Ex. 13) ¶ 8; Declaration of S. Khor ("First Khor Decl.") in support of MySpace's motion to modify PI Order (Chang Decl., Ex. 18) ¶ 7.

Defendants are business partners[9] that specifically targeted MySpace as their primary marketing vehicle.  Rines FTC Dep. Tr., 54:3-55:2 ("I know [Wallace] generally gets users that are MySpace users."), 77:3-20 (Wallace approached Rines in October 2006 about "MySpace traffic"); Wallace Decl. ¶ 3 ("I have developed effective delivery

---

[9] MySpace previously established, on its motion to modify the PI Order, filed on October 1, 2007, that Rines and Wallace work in concert to earn revenue based on MySpace traffic.  *See also* Wallace FTC Dep. Tr. 53:18-54:5, 75:24-77:15, 81:5-83:16 (testifying that he "work[ed] with [Rines] on MySpace related activities" in an "official business relationship," and theirs is a "collaborative effort" to "direct[] MySpace users to various websites including Freevegasclubs.com and Realvegassins.com."); Rines FTC Dep. Tr., 32:2-18, 34:25-37:18, 54:16-55:2, 93:14-94:16 (confirming that he began working with Wallace in October 2006, and knew they generated "a lot" of traffic from MySpace).

methods by integrating MySpace-'s [sic] publicly available features into the distribution model."). Indeed, Wallace proclaimed that he would lose his "entire" business if he were to be precluded from marketing through MySpace. *See id.* ¶ 15 ("If the injunction issues as written, I will lose my entire internet business which earns approximately $1 million per year.").

In or around October 2006, defendants began creating groups, profiles, and events on MySpace promoting the Defendants' Websites. *See FAC* ¶ 18; Frazier Decl. ¶ 2; Wiley Decl. ¶¶ 3-4; Rines FTC Dep. Tr., 32:4-16 (testifying that he has been "assisting" Wallace since October 2006); Wallace FTC Dep. Tr. (Chang Decl., Ex. 6), 83:5-16 (testifying that beginning in October 2006, he and Rines had been directing MySpace users to the Defendants' Websites). Defendants' massive spamming campaign on MySpace was achieved through the use of hijacked accounts, the login identification and passwords of which were obtained through false, deceptive, and/or misleading means (the "Phishing Scam"). FAC ¶¶ 18-19, 24, 27; Frazier Decl., ¶¶ 2-5; Wallace FTC Dep. Tr., 87:4-22, 122:16-123:9, 124:11-22. Recipients of these spam messages, who responded to their offers, were taken to Defendants' Websites that falsely appeared to be sponsored by MySpace, and prompted to input their MySpace login information. *See* Frazier Decl. ¶¶ 4-7. The promotions were set up to make it appear to users that they had to "log on" to MySpace to obtain the special promotion. It is clear from the more than 800 user complaints received by MySpace about defendants' activities that users were unaware that they were providing MySpace login information to defendants to use to access their accounts and send out unsolicited emails to all of their friends promoting Defendants' Websites. *See id.* ¶ 15, Ex. K.

By using hijacked accounts to send these unsolicited messages, defendants created the false impression that these messages came from a MySpace recipient's friend or another legitimate MySpace user, rather than from defendants. FAC ¶ 25. Indeed, Wallace testified that defendants only used hijacked accounts to send these messages.

MYSPACE'S MOTION FOR DEFAULT JUDGMENTS AGAINST DEFENDANTS

Wallace FTC Dep. Tr., 100:15-101:9 (admitting messages were sent through other users' accounts, "friend to friend," but not through the dummy profiles).

Between 2006 and 2007, defendants hijacked accounts to post comments and send hundreds of thousands of unsolicited commercial email messages to MySpace members:

➢ Between October and December 2006, defendants used more than 300,000 profiles to post at least 890,000 comments.[10] FAC ¶ 26; Frazier Decl. ¶ 13.

➢ On March 23, 2007, MySpace discovered that defendants used hijacked profiles to send at least 6,000 unsolicited messages. Wiley Decl. ¶ 7.

➢ On March 27, 2007, MySpace discovered that defendants used 328,303 hijacked profiles to send 392,726 unsolicited messages. Frazier Decl. ¶ 7; Wallace FTC Dep. Tr., 119:25-120:27, 124:11-22; 126:8-17 (admitting to this attack and using "legitimate MySpace" accounts to send "thousands" of spam).

➢ On May 16, 2007, MySpace discovered that defendants used at least 5,306 hijacked profiles to send 5,783 unsolicited messages. Frazier Decl. ¶ 9.

➢ On May 20, 2007, MySpace discovered that defendants used 8,935 hijacked profiles to send at least 10,125 unsolicited messages. *Id.*, ¶ 8.

➢ Between May 10 and June 14, 2007, defendants used 76,200 hijacked profiles to send at least 110,000 unsolicited messages. Kaleel Supp. Decl. ¶ 11.

➢ On August 14, 2007, *after the preliminary injunction had been entered,* MySpace discovered that Rines used 53,162 profiles to send 78,137 unsolicited messages ("fake video spam attack"). Declaration of S. Khor ("Second Khor Decl.") in support of this Motion, filed concurrently herewith, ¶ 4.[11]

---

[10] MySpace called Wallace soon after these attacks began, to demand that he cease and desist from spamming MySpace. Wiley Decl. ¶ 4; FAC ¶ 20.

[11] *See also* First Khor Decl. ¶¶ 3-5, 7; Chang Decl., ¶ 24, Ex. 20 (data showing Rines as the registrant to websites promoted by the fake video spam attack); and MySpace's motion to modify the PI Order, filed on October 1, 2008, at pp. 4-6.

➢ On August 26, 2007, MySpace discovered that an additional 130,908 unsolicited messages were sent as part of the fake video spam attack. *Id.*, ¶ 6.

➢ On August 27, 2007, MySpace discovered that Rines used a hijacked profile to create a group that by September 30, 2007 contained 251,878 members. First Khor Decl. ¶¶ 8, 10; *see also* Wallace FTC Dep. Tr., 75:10-12 (admitting to creating groups for the purpose of promoting Defendants' Websites).

➢ On August 30, 2007, Rines used another profile to create a group that by September 27, 2007 contained 536,253 members. First Khor Decl. ¶¶ 11-12.

➢ Between September 5, 2007 and September 10, 2007, Rines created at least 2,244 additional groups. *Id.* ¶ 13.

➢ As recently as January 28, 2008, Rines was involved in an attack on MySpace where he literally raised his middle finger to taunt MySpace. *See* Declaration of Joseph Marotta in Support of MySpace's Motion for Default Judgments.

In addition, defendants admittedly created at least 11,000 dummy profiles through the use of automated script, bot, or other executable program in violation of MySpace's TOU Contract.[12] FAC ¶¶ 21-22; Kaleel Decl. ¶ 16; Wallace FTC Dep. Tr., 102:6-18 ("definitely created somewhere between five and 10,000, possibly 11,000" dummy profiles), 103:15-104:6 (used "an automated script" to create these profiles"). Wallace claims these profiles were created to "test" a method that could be used to drive traffic from MySpace. Wallace FTC Dep. Tr., 102:19-25.

By sending messages from hijacked accounts, defendants created the false impression that the messages came from legitimate MySpace members rather than from

---

[12] The Court previously ruled that the evidence submitted in support of the PI Motion was insufficient to support a finding that defendants used an automated bot to create these profiles. *Wallace*, 498 F. Supp. 2d at 1304. MySpace subsequently obtained Wallace's deposition transcript from the FTC through a FOIA request, in which Wallace testified to using an automated script to create these fake profiles. Chang Decl. ¶ 8. Despite his prior testimony, Wallace, falsely represented otherwise in his declaration in opposition to the PI Motion. *See* Wallace Decl. ¶ 9.

defendants.  FAC ¶ 25; *see also* Wallace FTC Dep. Tr., 131:3-16 ("We did not send anything to people.  Their friends did, and we just enabled it…It's not something coming from a stranger with a fake return address…This is friend to friend communication…").

None of these unsolicited messages contained a clear and conspicuous notice that they were advertisements and solicitations for the Defendants' Websites, or advised recipients of their right to opt out or decline to receive further commercial messages from defendants.  FAC ¶ 24; Wallace FTC Dep. Tr., 129:2-8; Frazier Decl. ¶ 16; First Khor Decl. ¶ 15.  Additionally, if a user tried to respond to the messages to decline to receive further messages from the sender, the response would go back to the MySpace member whose account had been hijacked, not to the defendants themselves.  *See Wallace*, 298 F. Supp. 2d at 1304.  In addition, none of these messages contained a valid physical postal address for defendants.  FAC ¶ 24; Frazier Decl., ¶ 16.

These messages, comments, or group pages were designed to trap recipients into navigating to Defendants' Websites.  Recipients were automatically redirected to the Defendants' Websites, and when users tried to navigate out of them, they were automatically redirected to advertising, scam, and adult content sites, and mouse-trapped there,[13] with no way of navigating back to MySpace.com.  *See* Frazier Decl. ¶ 8, Ex. G; First Khor Decl. ¶ 7.  Defendants inserted code into the 890,000 comments that hampered the users' ability to delete the comments.  Frazier Decl. ¶ 13, Ex. J.

Defendants willfully committed each of the unlawful acts described above.  FAC, ¶ 30.  *See also* Rines FTC Dep. Tr., 54:3-55:2, 77:3-20.  Wallace also testified in his FTC deposition in April 2007, that he and Rines will continue to promote the Defendants' Websites through MySpace.  *See* Wallace FTC Dep. Tr., 128:1-5; *see also* Rines FTC

---

[13] ***Mouse-trapping*** is a technical trick that "involves manipulating consumers' Internet browsers (such as Netscape or Internet Explorer) to prevent consumers from leaving defendants' [websites]."  *See* Ballon Decl., Ex. C (Memorandum of Law in Support of Plaintiff FTC's Motion for An Ex Parte Temporary Restraining Order, *FTC v. Pereira*, Civil Action No. 99-1367-A (E.D. Va. 2001)).

1 Dep. Tr., 93:14-24 (confirming that Wallace is still generating traffic, and that "probably

2 a lot of it is from MySpace").

3 **E.    Defendants Unlawfully Used MySpace's Trademark To Deceive Users**

4      MySpace is the owner of the famous MYSPACE registered marks and logo (the

5 "MySpace Marks"). FAC ¶ 16, 45; Declaration of K. Datoo ("Datoo Decl.") ¶ 2, Ex. A.

6 Since MySpace's launch in mid-2003, MySpace has become the second most visited

7 website in the world, attracting more than 220 million members and generating more than

8 27 billion page views per month as of April 2006. FAC ¶ 46; Datoo Decl. ¶ 3; *see also*

9 Datoo Decl. ¶¶ 4-6 (In 2007, MySpace spent more than $2.6 million to promote the

10 MySpace Marks and ranked first in most page views), and Exs. C, D.

11      In furtherance of defendants' Phishing Scam, their websites contained

12 unauthorized reproductions of the MySpace Marks, logo and trade dress on pages where

13 users were prompted to input their MySpace login information, creating the false

14 impression that the websites were sponsored by or affiliated with MySpace. FAC ¶ 28;

15 Frazier Decl. ¶ 5. For example, one user stated that the login prompt on the Phishing

16 Scam websites "looked exactly as it does when you normally log in to myspace." Frazier

17 Decl. ¶ 15, Ex.. K at p. 47.

18      The association with defendants' phishing and spamming activities dilutes,

19 tarnishes, and otherwise diminishes the value of MySpace's mark. FAC ¶28. Defendants

20 were also aware that their use of MySpace's trademark was not authorized. *Id.* ¶ 29.

21 **F.    Resulting Harm To MySpace**

22      Defendants' illegal transmissions of commercial electronic messages to MySpace

23 users via MySpace's automated email, bulletin and comment system has harmed and

24 continues to harm MySpace and cause it to incur substantial costs and expend valuable

25 resources. Kaleel Decl. ¶¶ 21, 22; Frazier Decl. ¶ 14.

26      MySpace's goodwill and reputation have also suffered. FAC ¶ 32. As noted

27 above, MySpace received over 800 user complaints that illustrate extent of harm caused

28

by defendants. Frazier Decl. ¶ 15, Ex. K.  These complaints also confirm that defendants caused actual confusion among MySpace users who, by the Phishing Scam, were deceived into providing their login information, or otherwise mistakenly believed that MySpace was affiliated with or a sponsor of Defendants' Websites.  *Id.*; FAC ¶ 32.

Defendants' activities are particularly nefarious because MySpace users, including undoubtedly those who are minors, were redirected to websites that contain offensive pornography and then mouse-trapped so that they could not leave the promoted site. Frazier Decl. ¶ 15, Ex. K.  MySpace allows anyone over 14 years old to obtain a MySpace account, and for that reason, is especially concerned about creating a safe environment for members who are children.  Kaleel Decl. ¶ 14.  This concern is shared by its members, as illustrated by complaints it received about defendants' spamming.[14]

## G.  Defendants Earned Millions Of Dollars In Profit From MySpace Traffic

While MySpace has suffered irreparable harm caused by defendants' unlawful spamming and phishing, defendants have inversely profited from these activities, earning millions of dollars in advertising revenue based upon MySpace traffic since October

---

[14] Such complaints include the following:
  ➢ "When people try to watch my slideshow there is a thing for a free easter card that won't go away.  when [sic] you click on it won't let you leave the site.  It also goes to some porn thing and I don't want that associated with my myspace.  I am a preacher's wife and have church members who have myspace pages.  Please help me solve this."  Frazier Decl., Ex. K at p. 63.
  ➢ "If you click cancel it goes to an XXX rated site…I have children and I do not want them to click on it if I leave my page open."  *Id.* at p. 64.
  ➢ "i have an easter ecard on my pg that keeps popping up…its a porn site that shows everything.  i have young teens on my pg [sic] that don't need to see or hear that kinda of stuff, i have tried to remove it but when i click on it, it keeps going to the porn (dating) site."  *Id.* at p. 65.
  ➢ "I just had a HORRIBLE EXPERIENCE on MySpace.  I am a brand new member…I was on my daughter's profile page when a pop-up suddenly appeared…[that] was VERY CLEVERLY DISGUISED to appear as part of MySpace…I clicked on the icon…and a very GRAPHIC PORN SITE APPEARED with obscene visuals…."  *Id.* at p. 91.

2006.  *See* Wallace FTC Dep. Tr., 85:13-89:5, 91:12-24, 114:24-115:6.  In April 2007, Wallace estimated that he made "over $200,000 and under $500,000" between October 2006 and April 2007 as a result of his MySpace activities.  *Id.*, 114:24-115:6.  By June 2007, Wallace declared that his "internet business," which depends upon MySpace traffic, generates "approximately $1 million per year."  Wallace Decl. ¶ 15.

Further, in August 2007 alone, Rines earned nearly half a million for promoting Ringtones.net in the fake video spam attack.  *See* Chang Decl. ¶ 2, Ex. 19 (DirecTrack data produced by Digital River, Inc.) at line 11 (revenue based upon more than 35,000 leads, i.e. actual subscriptions); *see generally* Shing Decl.  In addition, Fling.com paid Rines over $900,000 for generating leads (subscriptions) between December 2006 and September 2007.  *See* Chang Decl. ¶ 25, Ex. 21 (documents produced by Fling.com).  Both Rines and Wallace testified that each receives 50% share of the profits.  Wallace FTC Dep. Tr., 88:13-21; Rines FTC Dep. Tr., 37:3-18, 38:22-39:16.

The full extent of defendants' profits from their illegal spamming on MySpace is unknown because MySpace was prevented by defendants from obtaining discovery.[15] Nevertheless, the Court can reasonably infer that since October 2006, defendants have earned substantial revenue from their illegal activities.  Wallace admitted in his declaration filed in this action to earning $1 million per year from MySpace (suggesting that defendants jointly had earned at least $2 million as of that date) and Direct Track evidence alone shows that thereafter Rines earned approximately half a million dollars in just one month -- August 2007.

## III.    LEGAL ARGUMENT[16]

---

[15] Wallace admitted that he has "a spreadsheet that clearly lays out every dollar received," (Wallace FTC Dep., 115:7-14), but because he ignored MySpace's discovery requests and court orders compelling production, MySpace has been unable to obtain it.

[16] In determining whether to grant a default judgment pursuant to Rule 55(a), a court considers a number of factors, including (a) the substantive merits of plaintiff's claim, (b) the sufficiency of the complaint, (c) the amount of money at stake, (d) the possibility of prejudice to plaintiff if relief is denied, (e) the possibility of dispute as to any material

13

**A.     MySpace Is Entitled To Statutory Damages Under CAN-SPAM (Count I)**

1.     <u>The Court has already found multiple violations of CAN-SPAM</u>

MySpace has adequately alleged, *and this court has previously concluded* based upon evidence submitted in support of MySpace's PI Motion, that defendants have violated multiple provisions of the CAN-SPAM Act. *See Wallace*, 498 F. Supp. 2d at 1299-1305. Specifically, defendants have violated at least four separate sections of CAN-SPAM, namely 15 U.S.C. §§ 7704(a)(1), (a)(3), (a)(5) and (b)(2):

➢ **False header information**: Defendants violated 15 U.S.C. § 7704(a)(1) by obtaining, through false and/or deceptive means, more than 475,000 MySpace members' usernames and passwords, and using those "hijacked accounts" to send more than 735,925 spam messages to other members.[17]  FAC ¶¶ 25, 27,

---

facts in the case, and (f) whether default resulted from excusable neglect. *Eitel v. McCool*, 782 F.2d 1470, 1471-1472 (9th Cir. 1986). Where there is ample evidence in the record, no further evidentiary hearing is necessary. *See James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993) (upholding award of punitive damages and attorneys' fees without evidentiary hearing).

Upon default, the defendants' liability is established through the well-pleaded allegations of the complaint. *See Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) ("With respect to the determination of liability and the default judgment itself, the general rule is that well-pled allegations in the complaint regarding liability are deemed true."). The court can enter default judgment against a defendant as long as the defendant is not "an infant or incompetent person," and not otherwise exempt under the Soldiers' and Sailors' Civil Relief Act of 1940. Fed. R. Civ. Proc. 55(b); Local Rule 55-1 (C.D. Cal. 2007). A plaintiff need only to prove up damages to obtain a default judgment. *See Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977).

[17] "Section 7704(a)(1) prohibits the use of false or misleading header information, including header information that is 'technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations.'" *Wallace*, 498 F. Supp. 2d at 1301 (*citing* 15 U.S.C. § 7704(a)(1)(A)). Header information "is defined as 'the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message.'" *Id.* (*citing* 15 U.S.C. § 7702(8)).

14

36-37.  The court previously found that the evidence submitted in support of MySpace's PI Motion showed that "Defendant obtained access to other members' usernames and passwords by creating websites that appeared nearly identical to the log-in page at MySpace.com," and that the 400,000 messages defendants sent via 340,000 of these hijacked accounts "clearly violated this subsection." *Wallace*, 498 F. Supp. 2d at 1301 (concluding that "[t]his clearly falls within the category of messages prohibited where the header might be accurate but access to the account from which it came was falsely and fraudulently obtained").  In addition, MySpace has documented evidence that defendants used hijacked profiles to send over 800,000 unsolicited messages or group invites to promote the Defendants' Websites:  6,000 messages in or around March 2007 (Wiley Decl. ¶ 7); 110,000 messages between May 10 and June 14 (Kaleel Supp. Decl. ¶ 11); 78,137 messages sent by Rines on or around August 14 (Second Khor Decl. ¶ 4); 130,908 messages (by Rines) on or around August 26 (*id.* ¶ 6); and invitations sent by Rines to users to join 2,246 groups between August and September 2007 (First Khor Decl. ¶¶ 7-8, 10-13).

➢ **No valid return email address**:  Defendants also violated 15 U.S.C. § 7704(a)(3)[18] by using hijacked accounts to transmit spam without providing a functioning return email address.  If a user replied to one of these spam

---

[18] "Section 7704(a)(3) prohibits sending commercial mail that does not contain a functioning return electronic mail address, active for at least 30 days following the date of the message, to which a recipient can send a request that no further messages be sent." *Wallace*, 498 F. Supp. 2d at 1302 (*citing* 15 U.S.C. § 7704(a)(3)(A)).  To recover for a claim under this subsection, there must be a "pattern or practice" of the prohibited conduct.  15 U.S.C. § 7706(g)(1).  The terms "pattern or practice" are defined by their ordinary meanings, and means more than one isolated act in violation of CAN-SPAM. *See id.* (*citing Cherosky v. Henderson*, 330 F.3d 1243, 1246-47 (9th Cir. 2003); *U.S. v. Ironworkers Local 86*, 443 F.2d 544, 552 (9th Cir. 1971) ("pattern" and "practice" were "not intended to be words of art"); and *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 358 (4th Cir. 2006) (one violation was not a pattern or practice)).

messages opting out of further unsolicited commercial communications, the message would be sent to the owner of the account hijacked by defendants, not to defendants. Again, the court previously determined that the "detailed record" of the attacks discovered on March 27, 2007 (392,726 messages sent from 328,303 accounts), May 16 (5,783 messages from 5,306 accounts), May 20 (10,125 messages from 8,935 accounts), and between May 10 and June 14 (110,000 messages from 76,200 accounts), "adequately demonstrates that Defendant has engaged in a pattern of violations sufficient under section 7706(g)(1)." *Wallace*, 498 F. Supp. 2d at 1302-1303. Following the PI Order, MySpace discovered that at least 211,291 messages were sent in violation of this subsection. Altogether, these attacks further confirm that defendants were engaged in a "pattern or practice" of sending spam messages without a functioning return electronic mail address to which a recipient can send a request that no further messages be sent.

> **No valid postal address or "clear and conspicuous" notice of commercial solicitation with right to opt out**: Defendants violated 15 U.S.C. § 7704(a)(5) (the consumer protection provision)[19] because none of the 735,925 spam messages contained a clear and conspicuous notice that they were advertisements and solicitations for the Defendants' Websites or advise recipients of their right to opt out, or decline to receive further commercial mail messages.[20] In addition, none contained a valid physical postal address for

---

[19] "Section 7704(a)(5) requires that all commercial electronic messages contain 'clear and conspicuous identification that the message is an advertisement or solicitation,' 'clear and conspicuous notice of the opportunity to decline to receive further commercial electronic mail messages from the sender,' and 'a valid physical postal address of the sender.'" *Wallace*, 498 F. Supp. 2d at 1303 (*citing* 15 U.S.C. § 7704(a)(5)(A)). There must also be a "pattern or practice" of unlawful conduct to support a claim. *Id.* (*citing* § 7706(g)(1)).

[20] There is no question that these messages were commercial in nature. Even Wallace proclaimed that "intent [of the messages] was commercial." Wallace FTC Dep. Tr., 120:23-121:2. The court also agreed based upon the previously submitted evidence that

16

defendants or their businesses. Frazier Decl. ¶ 16; First Khor Decl. ¶ 15;
Wallace FTC Dep. Tr., 129:2-8 (confirming messages did not provide notice
they were commercial in nature or would lead to advertisements and/or
commercial solicitation). Moreover, the court previously found that
"Defendant does not dispute" this fact and that "the evidence submitted by
Plaintiff demonstrates a pattern of acts that violate this subsection." *Wallace*,
498 F. Supp. 2d at 1304. The additional 211,291 messages discovered since
the PI Order was entered also violate this subsection.

> **Use of scripts or automated means to register multiple MySpace accounts**:
By Wallace's own admission, Defendants violated 15 U.S.C. § 7704(b)(2)[21] by
using "an automated script" to create 11,000 dummy profiles on MySpace.
Wallace FTC Dep. Tr., 75:24-77:2, 102:6-18, and 103:15-104:6.[22] Further, the
complaint alleges that Defendants used these profiles to send spam messages to
MySpace users. FAC ¶¶ 21-24; *see also* Kaleel Decl., ¶¶ 16-18.[23]

2.   Statutory damages calculation

the purpose of the Defendants' Websites is to generate revenue by sending "hundreds of thousands of messages directing recipients to these websites." *Wallace*, 498 F. Supp. 2d at 1303. For that reason, "these messages, even if not commercial on their face, promote an 'Internet website operated for a commercial purpose' and are 'commercial electronic mail messages'" under the Act. *Id.*

[21] "Section 7704(b)(2) prohibits a person from using 'scripts or other automated means to register for multiple electronic mail accounts or online user accounts from which to transmit…a commercial electronic mail message that is unlawful under subsection(a)' of section 7704." *Wallace*, 498 F. Supp. 2d at 1304.

[22] The court previously concluded that MySpace's evidence submitted in support of its preliminary injunction motion was insufficient to support a finding that defendants used scripts or automated bots to create the 11,000 dummy profiles. At the time, MySpace did not have access to Wallace's FTC deposition transcript and therefore did not submit this testimony in support of its PI Motion.

[23] Although MySpace alleged in the FAC that defendants used these dummy profiles to transmit unsolicited commercial messages, MySpace has not documented evidence that these profiles were indeed used to send spam.

17

Pursuant to the CAN-SPAM Act, MySpace, as an Internet access service, may recover actual damages or statutory damages, whichever is "greater."  15 U.S.C. § 7706(g)(1)(B).[24]  Statutory damages equal

> the amount calculated by multiplying the number of violations (*with each separately addressed unlawful message* that is transmitted or attempted to be transmitted over the facilities of the provider of Internet access service, or that is transmitted or attempted to be transmitted to an electronic mail address obtained from the provider of Internet access service in violation of section 7704(g)(1)(A)(i) of this title, *treated as a separate violation*) by - (i) up to $100, in the case of a violation of section 7704(a)(1)…or (ii) up to $25, in the case of any other violation of section 7704 of this title

*Id.* § 7706(g)(3)(A) (emphasis added).  "For any violation of section 7704 of this title (other than section 7704(a)(1) of this title), the amount determined under subparagraph (A) [re statutory damages] may not exceed $1,000,000."  *Id.* § 7706(g)(3)(B).  Thus, base damages are capped at $1 million *except* for violations of section 7704(a)(1) (false header information), which are *not* capped.

Aggravated damages of up to "three times the amount" of the base damage award is allowed if a violation was committed "willfully and knowingly."  *Id.*. § 7706(g)(3)(C).  Here, there is no doubt that Defendants willfully and knowingly spammed and phished on MySpace.  Indeed, Wallace admitted that he purposefully targets MySpace users

---

[24] An "Internet access service" may seek an injunction and/or damages for conduct prohibited by §§ 7704(a)(1) and 7704(b), or a "pattern or practice" that violates §§ 7704(a)(2)-(5).  15 U.S.C. § 7706(g).  In issuing the PI Order, this court has already implicitly ruled that MySpace is an "Internet access service" provider under the Act.  *See Wallace*, 498 F. Supp. 2d at 1299 ("Plaintiff's private right of enforcement exists only if defendant's messages fall within this statutory definition [of 'commercial electronic mail messages']"); *see also MySpace, Inc. v. The Globe.com, Inc.*, No. CV 06-3391-RGK (JCx), 2007 WL 1686966, at *3 (C.D. Cal. Feb. 27, 2007) (ruling MySpace is an "Internet access service" provider as provided under 15 U.S.C. § 7702(11)).

through hijacked accounts to generate traffic to earn millions of dollars.[25]  Since October 2006, defendants sent at least 735,925 unsolicited messages in violation of § 7704(a)(1).  *See* III(A)(1), *supra*.  MySpace seeks the maximum allowable statutory damages, calculated as follows:

| Number of Messages | Multiplier | Base Award | Aggravated Damages (Trebled) |
|---|---|---|---|
| 735,925 | $100 | $73,592,500 | $220,777,500[26] |

MySpace seeks an additional $3 million for all non-7704(a)(1) violations.  As noted above, defendants' spam were also sent in violation of 15 U.S.C. §§ 7704(a)(3) and 7704(a)(5), and defendants further violated 15 U.S.C. § 7704(b)(2) by using an automated script to create 11,000 dummy profiles.  For these violations, the base award is capped at $1 million (the multiplier of $25 per message x 735,925 messages exceeds the $1 million cap), trebled, for aggravated damages.

Therefore, the total amount of statutory damages MySpace seeks under Count I is:

| Damages for § 7704(a)(1) violations | Damages for all non-§ 7704(a)(1) violations | **Total statutory damages under the CAN-SPAM Act** |
|---|---|---|
| $220,777,500 | $3,000,000 | **$223,777,500** |

MySpace seeks damages of $157,390,200 from Wallace and $223,777,550 from Rines ($157,390,200 in joint and several liability and an additional $63,387,300 in separate liability for Rines's post-PI Order spamming).

---

[25] *See* Wallace FTC Dep. Tr., 76:10-77:2 (created groups to drive traffic from MySpace to freevegasclubs.com), 83:5-9 (admitting that since October 2006, defendants have been directing MySpace users to Defendants' websites), and 120:23-121:2 (admitting that thousands of messages were sent with "commercial intent" through hijacked accounts); *see also* FAC ¶¶ 30, 42.

[26] Of this amount, $63,387,300 represents aggravated damages for violations of § 7704(a)(1) based upon the post-injunction attacks by Rines that began in August 2007 (211,291 total messages sent; $21,129,100 base award x 3).  Although Rines and Wallace admitted to being business partners in these acts (*see supra*, n.9), Wallace did not acknowledge liability for these attacks.  Accordingly, MySpace seeks joint and several liability for pre-injunction attacks but only damages from Rines for the attacks that started in August 2007.

### 3.    No basis for mitigation of damages

The CAN-SPAM Act provides only two grounds that a court "may consider" to reduce damages, neither of which applies here. *See* § 7706(g)(3)(D).[27]  Except for these exceptions, CAN-SPAM Act damages serve as a *penalty* and therefore *cannot* be mitigated. *Phillips v. Netblue, Inc.*, No. C-05-4401 SC, 2006 WL 3647116, at *2 (N.D. Cal. Dec. 12, 2006).  "[T]he CAN-SPAM Act's statutory damages provisions are meant to penalize the spammer as opposed to compensate the victims of spam." *Id.* at *4.  This kind of penalty is especially appropriate here, where both the PI Order and a prior injunction obtained by the FTC in another court proved ineffective in halting defendants' illegal activities.

Substantial damages are warranted in this case both to punish and to deter further misconduct by defendants or others. *See Gordon v. Virtumundo, Inc.*, 2007 WL 1459395, at *8 (W.D. Wash. 2007) ("Once a plaintiff shows sufficient harm, it is clear that Congress intended to make  statement by imposing these large per-e-mail fines.");[28]

---

[27] Damages *may* be reduced if "(i) the defendant has established and implemented, with due care, commercially reasonable practices and procedures designed to effectively prevent such violations; or (ii) the violation occurred despite commercially reasonable efforts to maintain compliance with the practices and procedures to which reference is made in clause (i)." *Id.*  In opposing the PI Motion, Wallace did not attempt to show compliance with the CAN-SPAM Act and argued, instead, that use of hijacked accounts could not violate the Act because the header information could not be altered or faked (as the hijacked accounts belonged to legitimate MySpace users) and the messages contained a functional return email address (albeit of the hijacked user and not defendants). *See Wallace*, 498 F. Supp. 2d at 1301-1302.  The court, however, ruled that use of hijacked accounts could not provide a legitimate "end-run around" the Act, and concluded that "Defendant has repeatedly demonstrated his inability to comply with Plaintiff's rules of use or with federal law when using Plaintiff's services." *Id.* at 1302, 1308.

[28] Both Congress and the California legislature have found that spam imposes significant monetary costs that must be addressed. *See* 15 U.S.C. § 7701(6) ("The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services."); Cal. Bus. & Prof. Code § 17529(b) (spam is "an increasing drain on corporate budgets and possibly a threat to the continued usefulness of" email).  Indeed, at the time the California law was enacted, it was estimated that spam cost U.S.

20

*see also Kramer v. Cash Link Sys.*, 2004 WL 2952561 at \*7 (S.D. Iowa 2004) (entering default judgment in favor of a small ISP against three defendants in the amounts of $360,000,000, $720,000,000, and $140,000 for spamming in violation of Iowa's anti-spam law, RICO, and the Iowa Ongoing Criminal Conduct Act (IOCCA)); *Microsoft Corp. v. JDO Media, Inc.*, 2005 WL 1838609, at \*3 (W.D. Wash. 2005) (awarding statutory damages of $24,125,000 under Washington's anti-spam law (CEMA) ($1000 per spam message) based upon 24,125 spam messages sent to Hotmail accounts, and stating that "[g]iven the statutory language of CEMA, the court finds it has no discretion in the amount of damages it awards...[even though] the amount here appears to be excessive...."); *Am. Online, Inc. v. Smith*, 2006 WL 181674, at \*3 (E.D. Va. 2006) (awarding $5,325,000 against defendants for sending spam through "stolen" or "hijacked" IP addresses to AOL's members on a daily basis for 213 days, *i.e.* the maximum amount of statutory damages potentially recoverable under Virginia's anti-spam law (which allows $25,000 for each day a violation took place), plus fees).[29]

---

organizations more than $10 billion per year, and California organizations over $1.2 billion, "including lost man productivity and the additional equipment, software, and manpower needed to combat the problem." Cal. Bus. & Prof. Code § 17529(d). Spam is clearly a major problem that "threatens continued usefulness of the most successful tool of the computer age." *Id.* § 17529(b).

[29] My Space is also entitled to statutory damages of at least $13 million under California's anti-spamming statute, but is not asking for a separate award under this statute based on the larger amount of damages recoverable under the CAN-SPAM Act. By using hijacked accounts to send spam to other MySpace members, whose accounts are hosted on MySpace servers located in California, defendants violated California state law prohibiting email transmissions to or from California email addresses containing "falsified, misrepresented or forged header information," or a "subject line...likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the subject matter or contents of the message." Cal. Bus. & Prof. Code § 17529.5(a)(2)-(3); *see also* FAC ¶¶ 59-62. Statutory damages under § 17529.5 are calculated as "one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident." Cal. Bus. & Prof. Code § 17529.5(b)(1)(B)(ii). "Incident" "means a single transmission or delivery to a single recipient or to multiple recipients of

### B.    Damages Under Cal. Bus. & Prof. Code § 22948 *et seq*. (Count IV)

MySpace has adequately alleged and provided proof that defendants violated the Anti-Phishing Act which prohibits "any person, by means of a Web page," from soliciting, requesting, or inducing another to provide identifying information "by representing itself to be a business without the approval or authority of the business." Cal. Bus. & Prof. Code § 22948.2.  This court has already found that "[Wallace] obtained access to other members' usernames and passwords by creating websites that appeared nearly identical to the log-in page at MySpace.com."  *Wallace*, 498 F. Supp. 2d at 1301 (*citing* Frazier Decl. ¶¶ 7-8); *see also* FAC ¶¶ 63-65.  Wallace also admitted to using other members' accounts, whose login information was phished through his "tell-a-friend" scheme, to send spam.  *See* Wallace FTC Dep. Tr., 87:4-22.

MySpace is entitled to "the greater of actual damages or five hundred thousand dollars ($500,000)."  Cal. Bus. & Prof. Code § 22948.3(a)(1).  These damages may be trebled if "the defendant has engaged in a pattern and practice of violating Section 22948.2."  *Id.* § 22948.3(c)(1).  Moreover, "[t]he remedies provided in this section do not preclude the seeking of remedies…under any other applicable provision of law."  *Id.* § 22948.3(c)(3).  Here, defendants engaged in a pattern and practice by sending numerous messages that redirected MySpace users to websites containing fake MySpace login pages.  *See* Frazier Decl. ¶¶ 4-7; *Wallace*, 498 F. Supp. 2d at 1303.  Accordingly, in addition to other damages, MySpace is entitled to trebled damages of $1,500,000.

---

an unsolicited commercial e-mail advertisement containing substantially similar content."  *Id.* § 17529.1(j).  Although defendants likely sent multiple transmissions or "incidents" in a given day, it is beyond doubt that there were a minimum of thirteen different days on which attacks, or "incidents," occurred:  March 23, 2007 (6,000 messages; Wiley Decl. ¶ 7); March 27 (293,726 messages; Frazier Decl. ¶ 7); May 16 (5,783 messages; *id.* ¶ 9); May 20 (10,125 messages; *id.* ¶ 8); between May 10 and June 14 (110,000 messages; Kaleel Supp. Decl. ¶ 11); August 14 (78,137 messages; Second Khor Decl. ¶ 3); August 26 (130,908 messages, *id.* ¶ 6); August 27 (one group; First Khor Decl. ¶ 8); August 30 (one group; *id.* ¶ 11); September 5 (566 groups; *id.* ¶ 13); September 6 (746 groups; *id.*); September 7 (928 groups; *id.*); and September 10 (four groups; *id.*).

**C.     Liquidated Damages For Breach Of The TOU Contract (Counts VII, VIII)**

By using an automated script to create 11,000 dummy profiles on MySpace, and using phished accounts to send 735,925 unsolicited commercial messages to other MySpace users, and to post at least 890,000 comments on these hijacked profiles, defendants have breached the TOU Contract and are liable for liquidated damages.

The TOU Contract contains a liquidated damages clause that provides for $50 per "unsolicited email or other unsolicited communication":

> If you breach this Agreement and send unsolicited bulk email, instant messages or other unsolicited communications of any kind through the MySpace Services, you acknowledge that you will have caused substantial harm to MySpace.com, but that the amount of such harm would be extremely difficult to ascertain. As a reasonable estimation of such harm, you agree to pay MySpace.com $50 for each such unsolicited email or other unsolicited communication you send through the MySpace Services.

Kaleel Decl., Ex. 5 (TOU Contract effective April 11, 2007), p. 5. A court in this district has already found that this liquidated damages provision is reasonable and enforceable "$50 per message a reasonable estimation of Plaintiff's damages." *MySpace, Inc. v. The Globe.com, Inc.*, No. CV 06-3391-RGK (JCx), 2007 WL 1686966, at *10 (C.D. Cal. Feb. 27, 2007). Pursuant to this provision, MySpace is entitled to recover $81,296,250 for a total of 1,625,925 unsolicited emails or other communications, apportioned as follows: $70,731,700 from Wallace and $81,296,250 from Rines (representing $70,731,700 in joint and several liability and $10,564,550 from Rines only for post-PI Order violations).

**D.     Permanent Injunctive Relief Under The Lanham Act, The CAN-SPAM Act, and Cal. Bus. & Prof. Code §§ 14200, 17500, 17200, and 22948**

"Liability is established under both Section 32 and Section 43(a) [of the Lanham Act] if the plaintiff demonstrates (1) it owns a valid and protectable trademark, and (2) the defendant used in commerce a similar mark without authorization in a manner likely to cause consumer confusion, deception, or mistake." *Philip Morris USA Inc. v. Liu*, 489

F. Supp. 2d 1119, 1122 (C.D. Cal. 2007).  A violation of the Lanham Act also establishes a violation of California's Trademark Law (Cal. Bus. & Prof. Code §§ 14200, et seq.) (Count V), Unfair Competition Law (*id.* §§ 17200, *et seq.*), and False Advertising Law (*id.*, §§ 17500, et seq.) (Count VI).  *See Phillip Morris*, 489 F. Supp. 2d at 1123 ("Proof of trademark infringement under the Lanham Act independently constitutes unfair competition under California law."); *New West Corp. v. NYM, Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979).  Evidence of actual confusion is not required to establish likelihood of confusion, but where it is shown it constitutes strong evidence.  In addition, use of a famous mark in connection with spamming tarnishes the mark and therefore causes dilution.  *Am. Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 552 (E.D. Va. 1998).

Here, MySpace is the owner of the famous MySpace Marks.  Datoo Decl. ¶ 2, Exs. A, B; FAC ¶ 45.  As discussed above, defendants, used the MySpace Marks as part of their Phishing Scam to trick users into disclosing their user ID and passwords.  The 800+ user complaints evidence *actual* confusion.  *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 580 (N.D. Cal. 1999) ("most importantly, plaintiff can show actual confusion," which is "strong proof of the fact of likelihood of confusion").[30]

MySpace is entitled to injunctive relief for defendants' infringement of the MySpace Marks and unfair practices and under the CAN-SPAM and Anti-Phishing Acts to deter further misconduct.  *See* 15 U.S.C. §§ 1116, 7706(g)(1)(A); Cal. Bus. & Prof. Code §§ 22948.3, 14340(a), and 17200.  MySpace seeks, therefore, a permanent injunction in the form attached to this motion.[31]  *See Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

---

[30] MySpace is also entitled to disgorgement of defendants' profits of at least $1,351,757 for violating 15 U.S.C. § 1125(a), trebled to $4,055,271, but does not seek them in addition to damages under the CAN-SPAM Act.  *See* 15 U.S.C. § 1117(a); Chang Decl., Exs. 19 (DirecTrack data) and 21 (Fling.com data).

[31] The proposed permanent injunction is identical to the preliminary injunction except that it also prohibits the use of bots and scripts based on evidence (*see supra*, n.12) that was not available at the time of the PI hearing.

24

E.    **MySpace Is Entitled To Punitive Damages**

In addition to violating statutory unfair competition laws, defendants' illegal spamming and phishing constitutes common law unfair competition, for which compensatory and punitive damages are available. *See* Cal. Civ. Code § 3294(a); *Am. Republic Ins. Co. v. Union Fidelity Life Ins. Co.*, 470 F.2d 820, 826 (9th Cir. 1972) (punitive damages proper for unfair competition). Punitive damages are appropriate here to punish and deter defendants -- who brag that their "MySpace business" is a $1 million enterprise and who disregard court orders issued by this court and in the FTC action -- from future violations.

F.    **MySpace Is Entitled To Recover Its Attorneys' Fees**

MySpace further seeks attorneys' fees pursuant to the CAN-SPAM Act (15 U.S.C. § 7706(g)(4)), the Lanham Act (15 U.S.C. § 1117(b)), California Business & Professions Code §§ 17529.8(1)(2), 22948.3(c)(2), and 17200 et seq., and is entitled to attorneys' fees based on defendants' agreement to MySpace's Terms Of Use Contract (providing for indemnification, including reasonable attorneys' fees, for breach of the agreement, *see* Kaleel Decl., Ex. C at ¶ 16). Even though MySpace incurred substantial fees, it seeks a fee award pursuant to the formula prescribed by Local Rule 55-3 ($5,600 plus 2% of the amount over $100,000).

IV.    **CONCLUSION**

For the foregoing reasons, MySpace seeks the relief set forth in the proposed order.

DATED:  April 18, 2008                    GREENBERG TRAURIG, LLP


By _____
                    IAN C. BALLON
                    WENDY M. MANTELL
                    LORI CHANG
                    NINA D. BOYAJIAN

                    Attorneys for Plaintiff
                    MYSPACE, INC.

25

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

     I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is 2450 Colorado Avenue, Suite 400E, Santa Monica, California 90404.

     On April 18, 2008, I served the **PLAINTIFF MYSPACE, INC.'S NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENTS AGAINST DEFENDANTS SANFORD WALLACE AND WALTER RINES; MEMORANDUM OR POINTS AND AUTHORITIES** on the interested parties in this action by placing the true copy thereof, enclosed in a sealed envelope, postage prepaid, addressed as follows:

☒   **(BY MAIL)**

    ☒   I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at Santa Monica, California, in the ordinary course of such business.

     Sanford Wallace              Walter Rines
     7800 S. Rainbow Blvd., Apt. 1118   6 Laurel Lane
     Building 26                 Stratham, NH 03885
     Las Vegas, NV 89139

     Sanford Wallace
     6130 W. Flamingo Rd. #205
     Las Vegas, NV 89103

☒   **(BY OVERNITE EXPRESS)**

     I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for delivery by Overnite Express. Under the practice it would be deposited with Overnite Express on that same day with postage thereon fully prepared at Santa Monica, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if delivery by Overnite Express is more than one day after date of deposit with Overnite Express.

     Sanford Wallace              Sanford Wallace
     7800 S. Rainbow Blvd., Apt. 1118   6130 W. Flamingo Rd. #205
     Building 26                 Las Vegas, NV 89103
     Las Vegas, NV 89139

☒   **(FEDERAL)**     I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 18, 2008, at Santa Monica, California.

                              _____
                                    Signature

                                Jacquelyn Zwirn
                                    Print Name